SAM MESI, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 50868. Filed December 16, 1955.

*Howard R. Slater, Esq.*, for the petitioner.
*Edward L. Newberger, Esq.*, for the respondent.

516

**OPINION.**

Rice, *Judge:* This is another in a long series of cases involving the question of whether a bookmaker has accurately reported the income derived from his illegal gambling business. As in many of the previous cases, the respondent does not contest the accuracy of the gross receipts and operating expenses reported by the taxpayer, but has determined that the taxpayer overstated the wagering losses realized in his business and, consequently, understated his income. The first issue which we must decide, therefore, is whether petitioner is entitled to claim as a deduction the amounts shown on his records as having been paid to winning bettors, in computing the income earned from his bookmaking business in 1946.

In the instant case, the petitioner has supposedly maintained and preserved for the respondent's inspection a complete file of his original records. These records, more specifically the 20-line sheets, do not identify any of the bettors but they seem to contain an accurate listing of the amounts received and the amounts paid out with respect to every bet. Daily and monthly summaries of these 20-line sheets were compiled and, on the basis of such summaries, petitioner's return for the year here in issue was prepared. The mathematical accuracy of such summaries, and of petitioner's return, has not been questioned.

Petitioner's records and income tax return disclose total recipts from wagers amounting to $793,287.50 in 1946, and a gross profit on such wagers of approximately 5½ per cent. Respondent contends that since approximately 11½ per cent of the amounts wagered at parimutuel tracks in Illinois is retained for the benefit of the racing association and the State, and since the amount retained at parimutuel tracks throughout the United States ranges from 10 to 17 per cent of all bets placed, petitioner's reported gross profit for the year 1946 should have been 11½ per cent of the total wagers received. Therefore, in order to increase petitioner's gross profit from 5½ per cent to 11½ per cent,

respondent has determined that petitioner overstated the amounts paid out to winning bettors in the aggregate amount of $48,010.41.

The essence of respondent's argument is that petitioner must be presumed to have paid between 35 and 50 per cent of his net profits for protection from police interference with his illegal activities. Respondent contends that such nondeductible expenses must have been entered and concealed on petitioner's books by entering fictitious losses and by padding the amounts paid to winning bettors, thus resulting in a gross profit of but 5½ per cent. Respondent has, therefore, disallowed the deduction of $48,010.41 of the wagering losses claimed by petitioner, for lack of substantiation.

Respondent introduced the testimony of the chief investigator for the Chicago Crime Commission, an independent citizens' organization, to the effect that bookmakers cannot operate in Chicago unless they pay for protection. However, petitioner was unequivocal in his testimony that he did not make any payments for protection. The fact that other gamblers in Chicago may have been required to do so is of no evidentiary force with respect to any such payments made by petitioner. We do not know what petitioner's relations with the criminal syndicate were or why he may have been able to remain in business without paying for protection. But, in any event, the record indicates that petitioner's activities were not completely free from police interference. His wagering establishment was raided several times and petitioner was compelled to change his location and even operate from alleyways and a garage during the year 1946. We have consequently been unable to find as a fact that petitioner made any protection payments during that year.

We recognize the difficulties facing respondent in attempting to audit the records of a taxpayer who is engaged in an illegal business and where the identity of his customers is not ascertained and recorded. Petitioner's own accountant testified that there was no way in which the accuracy of the 20-line sheets could be verified as to the amounts received from and the amounts paid out to bettors. Moreover, petitioner's records were susceptible of easy manipulation. Lines on the 20-line sheets could be left blank until the end of the day and, after all the races had been run, petitioner could then enter fictitious bets on losing horses and retain such fictitious losses for his own personal use. In addition, since no control was maintained over the sequence in which the alphabetically and numerically coded 20-line sheets were used, those sheets disclosing few or no losses could be removed from the file of petitioner's records and the net receipts disclosed by such sheets could be pocketed by petitioner.

Our system of income tax collection relies on individual self-assessment. Taxpayers are required to file returns setting forth their

income, their deductions, and a self-computed tax. The self-assessment system would be unworkable unless means were provided whereby the accuracy of the self-determined tax could be checked. The regulations [1] therefore provide that each individual must keep such books and records as are sufficient to establish the individual's gross income. The mere mathematical accuracy of such records is insufficient; they must clearly reflect the taxpayer's income.

The issue of whether petitioner's records accurately reflect his income for the year 1946 is one of fact, to be decided on the basis of all the evidence in the record. *Jack Showell*, 23 T. C. 495 (1954), on appeal C. A. 9, Mar. 9, 1955. Respondent contends that, since petitioner's records do not permit the verification of the various payments made to winning bettors, he may determine the amount of deductions permitted to petitioner for such unsubstantiated expenditures under the rule of *Cohan* v. *Commissioner*, 39 F. 2d 540 (C. A. 2, 1930). However, although petitioner has failed to carry his burden of proving that the total amount claimed to have been paid to winning bettors was, in fact, so paid, we find respondent's determination of such amount to be excessive. Respondent has determined that $48,010.41 of the losses claimed by petitioner must be disallowed because his reported gross profit amounted to but 5½ per cent whereas the parimutuel machines in the State of Illinois operated on a gross profit of 11½ or 12½ per cent, depending upon their location. But, petitioner's winnings or losses have no relation whatsoever to the amount retained out of bets placed at parimutuel tracks. The evidence shows a lack of relation between the percentage of winnings in the petitioner's business and the amount retained at parimutuel tracks. The amount retained out of bets placed at such tracks is a mathematical amount established by law. The elements of chance and skill have but slight effect on the profits earned by such tracks. They could rarely lose, whereas petitioner might easily suffer substantial net losses from a day's betting if he accepted a disproportionate number of bets on winning horses. Cf. *H. T. Rainwater*, 23 T. C. 450 (1954). The mere suspicion on the part of the Commissioner that the petitioner's records do not accurately reflect his correct income is not sufficient reason to justify adoption of the Commissioner's percentage of winnings in the face of the evidence in this case which shows it is excessive.

---

[1] Regulations 111.

SEC. 29.54–1. RECORDS AND INCOME TAX FORMS.—Every person subject to the tax, except persons whose gross income (1) consists solely of salary, wages, or similar compensation for personal services rendered, or (2) arises solely from the business of growing and selling products of the soil, shall, for the purpose of enabling the Commissioner to determine the correct amount of income subject to the tax, keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of the gross income and the deductions, credits, and other matters required to be shown in any return * * *

The parties have stipulated that petitioner's records for 1 day during the year 1946 are to be considered typical of his records for that entire year. The records for that day, as submitted into evidence, disclose that in at least two instances the amounts entered on the 20-line sheets as having been paid to winning bettors were larger in amount than the amounts properly payable for such bets according to the betting tickets. Petitioner failed to explain such discrepancies adequately and, thus, to overcome respondent's determination that his claimed losses were overstated. On the basis of this record and bearing heavily on the petitioner, who failed to keep records with adequate controls and information subject to verification, *Jack Showell, supra*, we have found as a fact that petitioner overstated his deduction for wagering losses on his return for 1946 by the amount of $5,000. *Cohan v. Commissioner, supra.*

The second issue herein is whether petitioner is entitled to deduct, as ordinary and necessary business expenses, wages amounting to $14,563.84 which he paid to the various employees who aided him in the conduct of his illegal bookmaking business during 1946. In his deficiency notice, respondent has allowed the deduction of the various operating expenses claimed by petitioner except for the wages here in issue. Respondent contends that these wages are the "illegitimate expenses of an illegitimate business" and that to allow their deduction would frustrate sharply defined public policy.

It has long been accepted that certain deductions are not allowable for public policy reasons, although there is no specific provision in the Code or regulations to that effect. Thus, deductions have been denied for fines and penalties incurred for violation of Federal and State statutes, *Burroughs Bldg. Material Co.* v. *Commissioner*, 47 F. 2d 178 (C. A. 2, 1931); *Great Northern Ry. Co.* v. *Commissioner*, 40 F. 2d 372 (C. A. 8, 1930), certiorari denied 282 U. S. 855 (1930); *Julian Lentin*, 23 T. C. 112 (1954), affd. 226 F. 2d 695 (C. A. 7, 1955); *Joseph Saltzman*, 21 T. C. 777 (1954); *Henry Watterson Hotel Co.*, 15 T. C. 902 (1950), affd. 194 F. 2d 539 (C. A. 6, 1952); for bribes paid to public officials, *Frank A. Maddas*, 40 B. T. A. 572 (1939), affd. 114 F. 2d 548 (C. A. 3, 1940); for expenses incurred for certain types of lobbying engaged in to influence Federal legislation, *Textile Mills Corp.* v. *Commissioner*, 314 U. S. 326 (1941); and for legal expenses incurred in connection with the unsuccessful defense of criminal actions, *C. W. Thomas*, 16 T. C. 1417 (1951); *Anthony Cornero Stralla*, 9 T. C. 801 (1947).

The frustration of public policy rule has served as the basis for the disallowance of loss deductions under sections 23 (e) and 23 (f) as well as the disallowance of "ordinary and necessary" business expenses under section 23 (a) (1) (A). Thus, in a recent decision, a foreign corporation doing business within the United States was refused a

loss deduction, on public policy grounds, for property which had been vested with the Attorney General as enemy alien property under the Trading with the Enemy Act. *United States* v. *Algemene Kunstzijde Unie, N. V.*, 226 F. 2d 115 (C. A. 4, 1955). In *G. E. Fuller*, 20 T. C. 308 (1953), aff'd. 213 F. 2d 102 (C. A. 10, 1954), a loss deduction was denied for merchandise confiscated by the State because it had been illegally held for sale.

It has frequently been stated that, where fines and penalties are involved, their deduction as ordinary and necessary business expenses must be disallowed, for to do otherwise would have the effect of possibly frustrating governmental policies by reducing the impact of the penalty. See *Commissioner* v. *Longhorn Portland Cem. Co.*, 148 F. 2d 276 (C. A. 5, 1945), certiorari denied 326 U. S. 728 (1945); *Davenshire, Inc.*, 12 T. C. 958 (1949). Another line of cases in this area states the rule that though some business expenditures may be "ordinary and necessary" in the generally accepted meanings of these words, when they violate Federal or State law, thus frustrating sharply defined national or State policies proscribing particular types of conduct, they are not deductible as ordinary and necessary expenses under section 23 (a) (1) (A) of the 1939 Code. *Gallatin Farmers Co.* v. *Commissioner*, 132 F. 2d 706 (C. A. 9, 1942); *Boyle, Flagg & Seaman, Inc.*, 25 T. C. 43 (1955). See *Israel Silberman*, 44 B. T. A. 600 (1941); *Easton Tractor & Equipment Co.*, 35 B. T. A. 189 (1936); *Lorraine Corporation*, 33 B. T. A. 1158, 1166 (1936). As stated in *National Brass Works* v. *Commissioner*, 182 F. 2d 526, 530 (C. A. 9, 1950): "It is true that neither the tax statute nor the treasury regulations condition deductibility upon the lawful character, either directly or remotely, of the expenditure made. * * * But, in the nature of things, public policy must narrow the field of allowable deductions which rest as they do upon legislative indulgence." In two cases which have been before the Supreme Court, that Court has indicated its acceptance of this principle although, in both of these cases, no violation of a clearly defined public policy was found to exist. See *Lilly* v. *Commissioner*, 343 U. S. 90 (1952); *Commissioner* v. *Heininger*, 320 U. S. 467 (1943).

This Court has previously considered the question of whether one engaged in an illegitimate business may deduct the legitimate expenses of such business and, on the facts of that case, held that such expenses were deductible. *G. A. Comeaux*, 10 T. C. 201 (1948), affirmed sub nom. *Cohen* v. *Commissioner*, 176 F. 2d 394 (C. A. 10, 1949). However, the fact that an expenditure is directly related to the production of income does not automatically qualify it as deductible. Where the expense itself is inherently contrary to public policy its deduction must be disallowed. Although both the instant case and *G. A. Comeaux, supra,* involve the deductibility of wages paid to em-

ployees in an illegal bookmaking establishment, the instant case is clearly distinguishable. The record in this case establishes that the payments in question constituted the illegitimate expenses of an illegitimate business, whereas no such finding of fact was made in *G. A. Comeaux, supra*.

Section 336 of the criminal code of the State of Illinois, as quoted below, not only makes the conduct of a bookmaking establishment illegal but also provides that employees who assist in the conduct of such business by recording bets are equally guilty of the commission of an illegal act.

[ILLINOIS REVISED STATUTES 1945 (Burdette Smith).]

336. * * * That any person who keeps any room, shed, tenement, tent, booth or building, or any part thereof, or who occupies any place upon any public or private grounds within this State with any book, instrument or device for the purpose of recording or registering bets or wagers, or of selling pools, or any person who records or registers bets or wagers, or sells pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, or upon the result of any political nomination, appointment or election, or being the owner, lessee or occupant of any room, shed, tenement, tent, booth or building, or part thereof, knowingly permits the same to be used or occupied for any of these purposes, or therein keeps, exhibits or employs any device or apparatus for the purpose of recording or registering such bets or wages, or selling of such pools, or becomes the custodian or depository for hire or privilege, of any money, property, or thing of value staked, wagered or pledged upon any such result, shall be punishable by imprisonment in the county jail for a period not longer than one year, or by fine not exceeding $2,000 or both. Provided, however, that the provisions of this act shall not apply to the actual enclosure of fair or race track associations that are incorporated under the laws of this state, during the actual time of the meetings of said associations, or within twenty-four hours before any such meetings.

In addition, section 582 of the criminal code of the State of Illinois provides as follows:

[ILLINOIS REVISED STATUTES 1945 (Burdette Smith).]

582. * * * § 2. An accessory is he who stands by, and aids, abets or assists, or who not being present, aiding, abetting or assisting, hath advised, encouraged, aided or abetted the perpetration of the crime. He who thus aids, abets, assists, advises or encourages, shall be considered as principal, and punished accordingly.

Pursuant to these sections of the criminal code of the State of Illinois, the payment of the wages in question in and of itself constituted an illegal act. The wages paid by petitioner were paid to procure the direct aid of others in the perpetration of an illegal act, namely, the operation of a bookmaking establishment. Certainly, it would be a clear violation of public policy to permit the deduction of an expenditure, the making of which constitutes an illegal act.

We recognize that the disallowance of the instant expenditure may be almost tantamount to taxing petitioner on his gross rather than his net income. But it is axiomatic that deductions are a matter of legislative grace. *New Colonial Co.* v. *Helvering*, 292 U. S. 435

(1934); *Deputy* v. *du Pont*, 308 U. S. 488 (1940); *Detroit Edison Co.* v. *Commissioner*, 131 F. 2d 619 (C. A. 6, 1942), affd. 319 U. S. 98 (1943). Whether a taxpayer's business is a legal or an illegal one, it is inconceivable that he should be permitted a deduction for amounts spent to procure the commission of an act outlawed by a State statute. We, therefore, hold that petitioner is not entitled to deduct the wages paid to his employees during the year 1946.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: Many cases involving income and deductions of illegal businesses come before the Court, but this is the first one to my knowledge in which the Commissioner had disallowed a deduction for wages of regular employees claimed by an employer who is engaged in an illegal business. The Commissioner in many cases refuses to accept the net income shown on the books and records of an illegal business because the petitioner has destroyed the original records and the Commissioner has no way of verifying the accuracy and completeness of the books. The Commissioner here has disallowed the salaries of employees who made the original records which the Commissioner properly deems essential to a complete set of records and upon which he has relied in determining the total amounts bet. The Court is supporting him in this, and thus the expense of keeping the very records which are essential to a correct reflection of income is denied as an ordinary and necessary expense of the business.

These employees are engaged in the perpetration of the same crime through which the principal earns the income in question. Their wages, like rent, heat, light, telephone, and supplies, such as paper and pencils, are inherent expenses of the business, indispensable to the earning of the income in question. Rent and telephone expense would fall into the same category as these wages, if the landlord and the telephone company knew that gambling was conducted on the premises. To deny such deductions is to tax, to that extent, gross income. *G. A. Comeaux*, 10 T. C. 201, 207, affd. 176 F. 2d 394. Cf. *Commissioner* v. *Heininger*, 320 U. S. 467. Wages of real employees are different from bribes in that the giving of a bribe is a separate offense from the conduct of the illegal business. *G. A. Comeaux*, *supra.*

The allowance for wages should be the same in every State, but here the deduction is being disallowed because of a specific statute of the State of Illinois.

I think the deduction should be allowed.

HARRON, TIETJENS, and ATKINS, *JJ.*, agree with this dissent.