ALBERT D. MCGRATH AND ANNE MCGRATH, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 47206. Filed October 29, 1956.

*E. J. Blair, Esq.*, for the petitioners.
*J. Bruce Donaldson, Esq.*, for the respondent.

122

## OPINION.

TURNER, *Judge:* This is another of those cases wherein the primary question is as to the amount of gross income, namely, the ins less the outs, realized by an individual engaged in an illegal business of soliciting and accepting bets on horse racing. The respondent, in his determination, has accepted as petitioner's gross recipts from bets the amounts which were reported by him in his income tax returns, and petitioner makes no claim that they were in error. Respondent has not agreed, however, that the petitioner has correctly reported the amounts disbursed to winning bettors, namely, the outs, and in his said determination has disallowed the amounts claimed by $17,093.56 for 1948, $12,786.65 for 1949, and $15,948.59 for 1950.

The only available records relating to the years in question which purport to be records of original entry reflecting petitioner's gross profits from his bookmaking business, are the so-called 20-line sheets. Mathematically, the gross income reported by petitioner from bets for the taxable years was as reflected in the 20-line sheets, and if they are to be accepted as a complete and true recording of petitioner's operations, as petitioner contends they should be, the respondent's determinations of deficiency were in error.

Our first inquiry, accordingly, is as to the authenticity, accuracy, and completeness of the 20-line sheets as reflecting the business done.

See sec. 54, I. R. C. of 1939, and sec. 29.54–1, Regs. 111.[2] That they were not susceptible of substantiation or verification by audit, inquiry, or investigation is apparent of record, a fact assented to rather than denied by petitioner. All of the entries appearing on the sheets were made by petitioner or Zis, and any and all original slips and memoranda with respect thereto were destroyed. Except for the bets received by petitioner in person, and possibly some of the bets placed by the landlord, Emil Johnson, all bets, including those placed through Hitchler, are represented as having been received by telephone. It would also appear that, except possibly for some of Johnson's bets, the entries made by Zis were limited to bets he received in answering the telephone. And while the testimony with respect to bets received by telephone was that all such bets, except those telephoned in by Hitchler under his own name, were made against deposits of money previously made with petitioner or Hitchler, or the winnings of the bettor in a prior race, it further appears that no records were maintained or kept covering any such deposits, the amount of money so handled, the amount thereof absorbed by bets which were entered on the 20-line sheets, or the disposition of any balances not entered as bets on the 20-line sheets, and that any and all memoranda with respect thereto were destroyed. It accordingly follows that not only did petitioner fail to keep complete and adequate records covering his operations, but that the entries on the 20-line sheets are no better than the word of petitioner and Zis and, to some extent, that of Hitchler.

Aside from any questions we may have as to the credibility of Zis and Hitchler, and we are not in doubt, after observing and listening to them in the course of their testimony, that they knowingly disavowed and denied knowledge which they did have of some facts about which they were questioned, it is reasonable to conclude, we think, that

---

[2] SEC. 54. RECORDS AND SPECIAL RETURNS.

(a) BY TAXPAYER.—Every person liable to any tax imposed by this chapter or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe.

Regulations 111.

SEC. 29.54–1. RECORDS AND INCOME TAX FORMS.—Every person subject to the tax, except persons whose gross income (1) consists solely of salary, wages, or similar compensation for personal services rendered * * * shall, for the purpose of enabling the Commissioner to determine the correct amount of income subject to the tax, keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of the gross income and the deductions, credits, and other matters required to be shown in any return under chapter 1. Such books or records shall be kept at all times available for inspection by internal-revenue officers, and shall be retained so long as the contents thereof may become material in the administration of any internal-revenue law.

Income-tax forms shall be prescribed by the Commissioner and shall be executed and filed in accordance with these regulations and the instructions on the form or issued therewith.

the record on the 20-line sheets of the bets telephoned in by Hitchler was substantially as Hitchler had given them over the telephone. According to the daily reports prepared and submitted to petitioner's accountant, both Hitchler and Zis were compensated at a flat rate of $48 per week, and there is no apparent reason whereby either would be influenced to report or record bets placed through Hitchler in any manner other than they were actually given to him. Hitchler was required to transmit by telephone the fact that he had the bets, prior to the starting time of the races on which the bets were made. Furthermore, since Hitchler would have to answer to any and all of the customers served by him who had picked winners and similarly would have to account to petitioner for the full amount of the bets which he did call in before post time, regardless of whether the bet was thereafter won or lost, it follows, we think, that he would not only report the bets accurately and in advance, but would insist that they be correctly recorded, so as to avoid having to account personally to those who had bet on winning horses but which bets had not been so entered on the 20-line sheets, or to petitioner for bets which he did not receive or call in. And at the end of the day, Hitchler would come in and check his memoranda of the bets he had received against the bets shown on the 20-line sheets under his name and would settle up with petitioner on the basis of such check. In short, regardless of any question generally as to the credibility of Hitchler and Zis, who recorded some, if not most, of the bets called in by him, there would appear to have been little, if any, likelihood that the business which he brought to petitioner was not generally recorded as it actually was, not only as to the bets themselves but as to the winners and the amounts of the winnings as well.

As to the remainder of petitioner's business, there is not only an absence of persuasive or convincing support in the evidence that the 20-line sheets are accurate and complete and that they reasonably reflect such business, but on the record before us, we are satisfied that they do not. The 20-line sheets had no sequence or order. They are not self-proving of the truth of the entries made thereon, as petitioner would seemingly have us believe, but, to the contrary, were easily susceptible of manipulation so as to distort and overstate the outs for any day. By the belated entry, after a race was run and the results known, of a losing bet or an entirely fictitious one as a winning bet, the 20-line sheets could, with ease, be made to indicate and show gross income in a lesser amount than it actually was, and petitioner was at all times in a position to make such false entries.

In that connection, the results shown by the 20-line sheets for 1948 and 1950 are quite significant. For 1948, the business produced by Hitchler, namely, $110,580.50 of the $225,321.10 shown as the total bets by the 20-line sheets, produced a gross profit for petitioner of

$20,363.45, whereas, according to the said entries, the remaining $114,-740.60 of business purportedly covering the bets received by petitioner in person and by him and Zis by telephone, but exclusive of the business produced by Hitchler, resulted in a net loss of $5,961. However remote, it is at least within the realm of possibility that for the year 1948 the bettors served by petitioner personally and who telephoned their bets to petitioner and Zis were more "skillful," "smarter," or "luckier" in their choice of horses than the bettors served by Hitchler, but the probability that as a group they were consistently and so substantially so is another matter. And yet, according to the 20-line sheets for 1950, petitioner was again net loser to those bettors, although by a lesser amount. For that year, the business produced by Hitchler, namely, $128,690.50 of the $259,864.50 shown as the total bets by the 20-line sheets, produced a gross profit for petitioner of $20,707.50, whereas the remaining $131,174, purportedly covering the bets received by petitioner in person and by him and Zis by telephone, but exclusive of the bets called in by Hitchler, again resulted in a net loss to petitioner, this time in the amount of $269.60. The record does not contain a similar breakdown for 1949, but we do know that according to the entries on the 20-line sheets petitioner's gross profits were only 5.56 per cent of the ins, as against 6.39 per cent for 1948 and 7.86 per cent for 1950.

We do have petitioner's word, given under oath, that the entries on the 20-line sheets are accurate and complete. But having observed him closely while he was testifying, and the record being as it is, we do not find his word, even under oath, deserving of belief, unless we can find credible supporting evidence therefor.

It is patent of record that petitioner has not hesitated to give false testimony when it has suited him to do so. He admits that he had known by sight a great number, if not a majority, of his customers for several years. To all appearances, they had lived or worked in his same neighborhood, and occasionally he had cashed checks for some of them. From the beginning of his testimony, however, and repeatedly therein, he disavowed any and all knowledge as to the real name and identity of each and every one of the individuals who ever placed bets with him, asserting that his knowledge in all instances was limited to the initials, nicknames, or symbols under which the bets were recorded. At one point, he was asked specifically, "is what you said this, that you do not know the names of any of these individuals other than the way which they are listed on your sheet?" To which he replied, "that is correct." He was then queried, "Not any at all?" To which he answered, "Not any." Subsequently, while being questioned as to whether horse players ever came in person into his second establishment as they did in the first, he testified that no one came into the second establishment at all but, except for those picked up by him on his way to his place of business, all wagers were negotiated either by

telephone or by the runner Hitchler. Upon further questioning, he admitted that the landlord, in person, had "made a bet once in a while," and it was next disclosed that the landlord, Emil Johnson, was "E. J." on the 20-line sheets. It further appears that Johnson was not such an occasional bettor that petitioner might inadvertently have overlooked him, for the record indicates that on 130 days in 1948, beginning with the month of March, "E. J." placed wagers with petitioner in the total amount of $5,300.50, which accounted for nearly 5 per cent of the bets purportedly received other than those brought in by Hitchler. Winnings in the amount of $4,460.05 were shown as paid to "E. J." during that year. During 1950 the record indicates that "E. J." placed bets on 149 days, for a total of $3,330, comprising 2½ per cent of the bets shown as purportedly received other than those brought in by Hitchler. On those bets, according to the 20-line sheets, "E. J." had winnings of $3,078.75.

Also in the course of his testimony, petitioner contradicted statements subscribed and sworn to in a protest previously filed with the respondent for 1949. He was asked if it was his practice to "lay off" portions of large bets received with other bookmakers, and testified that he had not indulged in that practice. In the protest he had sworn to the contrary, and when confronted therewith, it was his explanation that the protest had been prepared by his accountant and, having confidence in his accountant, he executed the protest without knowing what it contained. This latter incident further indicates the complete disregard and lack of concern for truth which permeates petitioner's entire case, including even the work done by and testimony of his accountant. The accountant, being faced with petitioner's testimony, offered the explanation first that the information that petitioner did lay off bets was received in conversations with petitioner, then, that the conversations may have related to the prior open room operations, next, that the protest may have followed the form he had used in the cases of other bookmakers, and then, that the information was from petitioner or the records he had received, but upon examination, while on the witness stand, of some of the daily reports which had come to him, he stated that they did not show layoff bets. These incidents are illustrative of the type and character of petitioner's evidence offered in support of the truth and accuracy of his records. We think they speak for themselves.

The record being as it is, and after careful consideration of such credible evidence as we do have, we have concluded and found that petitioner's books and records were inadequate to reflect the results of his operations and that the amounts shown and claimed as having been paid to winning bettors were padded and substantially overstated.

As indicated by his notice of deficiency, the respondent in his determinations herein has disallowed $17,093.56 for 1948, $12,786.65 for

1949, and $15,948.59 for 1950 of the outs reported and claimed by petitioner in his returns. Although not spelled out, the disallowances reduced the outs as claimed for 1948 and 1950 to within a few dollars of 86 per cent of the ins for those years, and for 1949, to exactly 90 per cent of the ins. The deficiency notice offers no explanation as to how the amounts allowed or disallowed were arrived at beyond the statement that gross income for the said years had been increased in the amounts stated "in accordance with the provisions of Sections 22 (a) and 41 of the Internal Revenue Code." It was the testimony of the revenue agent who made the examination of petitioner's records, however, that the winning bettors at parimutuel tracks in the State of Illinois, where petitioner operated, received 86 per cent of the bets made in a given race, and being unable to verify the outs actually paid by petitioner and since petitioner was paying the same odds as were paid at the tracks subject to specified limitations on the particularly high odds, he proposed in his report that the petitioner be allowed as his outs 86 per cent of the ins,[3] being, according to the witness, the same percentage of total bets paid to winning bettors at parimutuel tracks in Illinois.

Rather obviously, some possibilities, if not probabilities, seemingly tend to support the proposition that the operations of a bookmaker should show a better margin of profit than the percentages of total bets taken or retained by the management at the parimutuel track, and there are other possibilities which would appear to support the contrary view. Petitioner, for instance, as in the case of bookmakers in other decided cases, paid the track odds to winning bettors only up to a certain point. Furthermore, he, as a taker of bets, was a player of the horses himself, and there was no skimming off or taking from total bets any flat or fixed percentages by any third party, as is true in a parimutuel track operation, and if there were no winning bettors or under the odds paid by him where there were, his outs did not, percentagewise, equal the percentage of the total bets going to the winning bettors at the track. He not only stood in the place of a participant in the winning pool at the track but also realized as additional profit the percentage which the parimutuel tracks took or exacted from total bets in arriving at the amount of the winning pool. On the other hand, in an operation such as that of petitioner, the betting on any given day was not restricted to the races of a single track but covered and included races at most, if not all, of the tracks where a meet was currently going on, and there would seem to have been little likelihood that the spread of bets received by petitioner

---

[3] The parties have stipulated that at parimutuel racing tracks throughout the United States 83 to 90 per cent of all bets is distributed by the tracks to the winning bettors and that in the State of Illinois approximately 85½ per cent of all bets is distributed to winning bettors.

on any given race would have been ratably comparable to the bets placed on such race at the track, particularly when it is to be noted that the number of his customers was extremely small when compared with the total number of bettors which might reasonably be expected to be in attendance at the various tracks where the individual races were run. Under such circumstances, it could be that the bookmaker might have received only one bet and that a winning bet on a given race, which would mean that he not only had no profit on the race, but a loss, which in turn would mean that his profits on other races would be absorbed to the extent of such loss. It could be, however, and probably is not unlikely, that on numerous races there would be no winner at all, in which case the bookmaker, petitioner in this instance, would have as his profit the entire betting pool and, unlike the situation at the tracks, the winning pool would be the total of the bets placed, without any reduction such as occurs under the parimutuel operation.[4]

In the face of such possible or probable variances between the overall results in the operations of an individual bookmaker and that of a parimutuel operation at the track, we have heretofore concluded that the experiences of winning bettors at parimutuel tracks, when related to the total bets made, do not supply an objective measure for determining the outs paid to winning bettors of an illegal bookmaking business, and in the cases coming before us, we have reached our conclusions and made our findings as to such outs according to the evidence in the individual case. In *Morris Nemmo*, 24 T. C. 583, and *H. T. Rainwater*, 23 T. C. 450, we were satisfied from the evidence that the records which were maintained had been relied upon at arm's length by outside participants in the business and that they did on the proof reasonably and satisfactorily reflect the results thereof, and on the basis of such proof, concluded and held that the taxpayer had overcome the Commissioner's determination. In *Sam Mesi*, 25 T. C. 513, we concluded that while the evidence did show a lack of relation between the percentage of profits to total bets in Mesi's bookmaking business and the percentage of total bets retained in a parimu-

---

[4] In connection with the discussion just concluded, it may be of interest to note that as shown by the 20-line sheets the gross profits on the business produced by Hitchler for 1948 amounted to 18.4 per cent of $110,580.50, which was the total of the bets received by him, and that the outs to the winning bettors absorbed only 81.6 per cent of such total bets. This, in turn, means that the effect of respondent's determination for 1948 was that the gross profits on the remainder of petitioner's business for such year amounted to only 9.7 per cent of $114,740.60, said amount being the total of the bets received by petitioner personally and by him and Zis by telephone. And as to 1950, that as shown by the 20-line sheets the gross profits on the business produced by Hitchler amounted to 16 per cent of $128,690.50, which was the total of the bets received by him, and that the outs to the winning bettors on such business absorbed 84 per cent of such total bets, which, in turn, means that the effect of respondent's determination for 1950 was that the gross profits on the remainder of petitioner's business for such year amounted to only 11.2 per cent of $131,174, being the total of the bets received by petitioner personally and by him and Zis by telephone.

tuel operation at the track and that there was insufficient reason on the record to justify approval of the Commissioner's determination as to the amount of Mesi's profits, the evidence did show that his profits exceeded the amount reported, and on the evidence a determination of the amount shown was made.

Being satisfied, as above indicated, that on the evidence here petitioner's books and records were inadequate to reflect the results of his operations and that the amounts shown and claimed as having been paid to winning bettors were padded and substantially overstated, the question is as to the amount of such overstatement. And while there is no way of knowing the true profits with exactitude, we do know from petitioner's own records that in 1948 and 1950 he realized gross profits of $20,363.45 and $20,707.50, respectively, on the business produced by Hitchler, whereas on his total business for the said years, which in each instance was more than twice the business produced by Hitchler, the total reported profits were only $14,402.45 for 1948 and $20,437.90 for 1950. We also know that at the rate of profits produced by Hitchler's business petitioner's total gross profits would have been $41,588.61 for 1948 and $41,695.34 for 1950 and that, as determined by respondent, were $31,496.01 for 1948 and $35,386.49 for 1950. Granting that the bettors placing their bets with petitioner personally and with petitioner and Zis by telephone could have been more "skillful," "smarter," or "luckier" in their choice of horses than the bettors served by Hitchler and individually could have placed larger bets and, upon winning, their winnings, when compared with total bets, could have been ratably larger than the winnings of Hitchler's customers, we are not convinced, and we find no evidence of record for concluding that such variances justify the view that they resulted in net losses to petitioner for 1948 and 1950, as his records indicate, or that his gross profits on bets received for any one of the 3 years herein were less than respondent has determined. We so conclude and hold. For 1949, there might even be some grounds for the view that the gross profits as determined by respondent not only were not overstated, but that they were actually greater than determined. For reasons not shown, respondent allowed as the outs for that year 90 per cent of the ins, as against approximately 86 per cent for 1948 and 1950. What the basis was for the more liberal treatment for 1949 than for the other 2 years is not explained, but, by amended answer, the respondent has now alleged that the disallowance should be increased to compare with the disallowances made for 1948 and 1950. Such being the case, it was his burden to prove supporting facts for the additional claim, and this he has not done. His claim for increased disallowance for outs for 1949 is accordingly denied.

The final question for decision is whether petitioner is entitled to deduct as ordinary and necessary business expenses wages paid during

1948, 1949, and 1950 in the respective amounts of $4,112, $5,088, and $4,992, which he paid to Hitchler and Zis to perform services for him in the conduct of his illegal bookmaking business, and rent for those years in the respective amounts of $1,960, $620.85, and $480, paid to Emil Johnson for the leased premises where petitioner operated his bookmaking business.[5]

Section 336 of the Criminal Code of Illinois not only makes the conduct of a bookmaking establishment illegal, but provides that employees who assist in the conduct of such business by recording bets and the owner or lessor who knowingly permits his premises to be used or occupied for the conduct of such business are guilty of an illegal act. With respect to wages, the identical issue was before us, and decided, in *Sam Mesi, supra*. Here, as in that case, the payment of the wages in question was to procure the direct aid of Hitchler and Zis in the perpetration of an illegal act, namely, the operation of a bookmaking establishment. We held in the *Mesi* case that it would be a clear violation of public policy to permit the deduction of an expenditure the making of which itself constitutes an illegal act. There was no issue in the *Mesi* case as to the deduction of rent. However, we are of the opinion that the principles announced in that case are equally applicable to the rental payments in the instant case. Both of the petitioner's employees and his lessor were fully aware of the illegal nature of the bookmaking enterprise which was being carried on and in which they were participating. Moreover, the employees were not merely engaged in keeping records for the petitioner, but were actively engaged in the acquisition of wagers on horses in the various races run each day. We accordingly hold that the respondent did not err in his disallowance of the deductions for wages and rents.

In so holding, we have not overlooked the decision of the United States Court of Appeals for the Seventh Circuit, in *Commissioner* v. *Doyle*, 231 F. 2d 635, but, with due respect to that court, we feel that the views expressed in our opinion in the *Mesi* case are sound and that we should adhere to them. We realize, as the Court of Appeals pointed out, that the wages and rents herein did represent a part of the costs of carrying on the business being conducted and of earning the income being taxed, and that under the literal provisions of section 23 of the Code, they would be deductible. We feel, however, that it is established law that where the allowance of expenditures such as we have here as deductions would be "to frustrate sharply defined * * * policies" of a State, in this instance Illinois, they are not within the intent of the statute. See *Sam Mesi, supra*, and the cases cited therein. And in that connection, see the discussion and rationalization of the ques-

---

[5] There is no explanation for the decline in each succeeding year in the amount of rent paid. Whether it had any connection with Johnson's placing of bets with petitioner, is not shown.

tion in the opinion of the Supreme Court of the United States in *Commissioner* v. *Heininger*, 320 U. S. 467. See also *Anthony Cornero Stralla*, 9 T. C. 801, 820–822. Also, it may be noted that in this case the guilt of the parties, namely, petitioner, Zis, Hitchler, and Johnson, under Illinois law is an accepted fact, and under the statute the payments in question were parts of the commission of the illegal acts, thus the open question of guilt conjectured in the opinion in the *Doyle* case is not present here. See, however, *Murray Humphreys*, 42 B. T. A. 857, affd. (C. A. 7) 125 F. 2d 340, certiorari denied 317 U. S. 637.

*Decision will be entered under Rule 50.*