Charles English and Lorraine English Et Al. [1] v. Commissioner. English v. Commissioner
Docket Nos. 55907-55909.
United States Tax Court
T.C. Memo 1956-254; 1956 Tax Ct. Memo LEXIS 38; 15 T.C.M. (CCH) 1305; T.C.M. (RIA) 56254; November 16, 1956
*38 1. Held, amounts of business expenses determined. 2. Held, that payments for wages and rent violated clearly defined public policy of the State of Illinois, and are accordingly not deductible as ordinary and necessary business expenses under section 23(a)(1)(A) of the 1939 Code. Sam Mesi, 25 T.C. 513, and Albert D. McGrath, 27 T.C. (Oct. 29, 1956) followed. 3. Held, amounts of unsubstantiated payouts determined and disallowed. 4. Held, additions under sections 293(a) and 294(d), 1939 Code, sustained. William J. Cawley, Esq., 111 West Monroe St., Chicago, Ill., for petitioners. Robert *39 R. Veach, Esq., for respondent. HARRON Memorandum Findings of Fact and Opinion For the years 1949 and 1950, the Commissioner made determinations of deficiencies in income tax and additions under sections 293(a) and 294(d), 1939 Code. The Commissioner has made claim for increased deficiencies under section 272(e). The total deficiencies and additions now determined by the Commissioner are as follows: Docket Number
Year
Deficiency
Sec. 293(a)
Sec. 294(d)
55907
C. English
1949
$1,963.42
$ 98.17
1950
1,416.51
70.83
$298.83
55908
S. English
1949
1,934.90
96.75
1950
1,502.56
75.13
271.43
55909
E. Flanagan
1949
3,357.40
167.87
1950
2,032.45
101.62
388.57
In Docket No. 55908, Sam and Mary English, the petitioners have conceded that the Commissioner properly disallowed for 1950 a deduction of $700 which was alleged to have been for real estate taxes of the petitioners. The questions to be decided are as follows: (1) Whether a partnership in which petitioners are co-partners, which conducted a bookmaking business, incurred and paid operating expenses in amounts greater than those determined by the *40 Commissioner. (2) Whether expenditures of the bookmaking business for salaries and rent are nondeductible as constituting illegitimate expenses of an illegitimate business. (3) Whether deductions for payouts taken on the partnership returns for 1949 and 1950 were, in part, excessive. (4) Whether the additions under sections 293(a) and 294(d) of the Code were properly determined. Findings of Fact All of the petitioners reside in Chicago or in the vicinity of Chicago, Illinois. Joint returns were filed for the taxable years by Charles English and his wife, and by Sam English and his wife, with the collector for the first district of Illinois. Edward J. Flanagan filed an individual return with the collector for the first district of Illinois. Since the questions to be decided relate only to the petitioners, Charles English, Sam English, and Edward J. Flanagan, they are referred to hereinafter as the petitioners. During each of the years 1949 and 1950, the petitioners were equal partners in the operation of a bookmaking business known as the 3340 Club in Chicago. In the operation of this business, wagers were accepted at the location of the club on horse races. Occasionally bets *41 were accepted outside of the establishment when it was closed. For each of the years 1949 and 1950, the petitioners filed partnership returns with the collector for the first district for Illinois. In the partnership return for 1949, gross income and net profit were reported as follows: Gross bets received
$422,673.90
Total winnings paid out
392,766.70
Gross profit
$ 29,907.20
Total operating expenses (itemized)
15,388.55
Net profit
$ 14,518.65 The $14,518.65 net profit was reported as being equally distributed or credited (in the amount of $4,839.55 each) to the three aforementioned partners. In the partnership return for 1950, gross income and net profit were reported as follows: Gross bets received
$437,148.50
Total winnings paid out
413,550.60
Gross profit
$ 23,597.90
Total operating expenses (itemized)
14,443.30
Net profit
$ 9,154.60 The $9,154.60 net profit was reported as being equally distributed or credited (in the amount of $3,051.50 each) to the three partners. Charles English, Sam English, and Edward J. Flanagan each reported in his income tax returns for 1949 and 1950, as income from the partnership, the above-stated *42 equal share of net partnership income in the amounts of $4,839.55 and $3,051.50, respectively. Petitioners' bookmaking establishment, the 3340 Club, operated in an alley garage located behind a tavern at 3340 West Jackson Boulevard, Chicago. At the club, bets from various individuals were accepted and the establishment agreed to pay the bettor if he won his bet such odds as were shown by the pari-mutuel machines of the various race tracks located in different parts of the country, with the limitation that in no event would it pay more than $30 for $1, in respect of a win; $12 for $1, in respect of a place; and $6 for $1 in respect of a show. Additional limitations were 100 to 1 on daily double bets, and 15 to 1 on horses wagered on the parlay bets, with an over-all limitation of $100 to $1. To win a win bet, the horse wagered on must come in first; to win a place bet, the horse wagered on must come in first or second; and to win a show bet, the horse wagered on must come in first, second, or third. To win a daily double bet, the bettor must select in advance the winning horse in two races at a particular track, usually the first and second races. Parlay bets are similar to daily *43 double wagers, except they may be made to win, place, or show, and may be made on two or more horses at the same or different tracks. Like daily double bets, the horses must be selected in advance, and all must win, place, or show, depending on how they were bet to finish. The actual betting operations were conducted in the following manner: (a) The wagers, herein referred to as bets, were recorded on so-called 20-line sheets. (b) The 20-line sheets consisted of five pads of ten sheets each, with each sheet containing 20 lines. The lines were numbered in sequence throughout the pads, from 001 through 000, i.e., the top sheet of the first pad contained lines numbered 001 through 020 and the bottom sheet of the fifth pad contained lines numbered 981 through 000. (c) In addition, the sheets in each set of five pads were numbered numerically at the top from 1 through 50, and each set contained an alphabetical letter and a color identification, such as "T Yellow". (d) On top of each sheet was a sheaf of twenty tickets, herein referred to as betting tickets. The betting tickets were numbered and lettered to correspond to the line number and sheet-letter identification of the line *44 immediately below it. (e) The betting tickets were attached to the 20-line sheet by the gummed edge on the right side of the pad. (f) Each betting ticket overlapped the ticket next higher in numerical sequence, the tickets measuring vertically about twice the height of the lines to which they corresponded. (g) Both the 20-line sheets and the betting tickets contained six columns which, left to right, were for the following purposes: (1) The number of the horse on which the wager is placed; (2) a win column in which is written the amount of the bet if the wagerer bets his choice to win; (3) a similar column for place bets; (4) a similar column for show bets; and (5) and (6) two money columns for dollars and cents in which are written the amounts of winning bets. (h) A sheet of double-faced carbon paper was placed between each 20-line sheet and its corresponding betting ticket above it. (i) The sheet-writer collected the amount of the bet from the bettor and after recording the wager on the betting ticket (which caused a carbon-copy impression to be made on the 20-line sheet and also on the back of the betting ticket) tore off the betting ticket and gave it to the bettor as *45 his receipt. The betting tickets did not identify individual bettors. (j) All bets were required to be made before the start of the race, which was usually broadcast in the establishment over a loud speaker. (k) Winning bettors presented their winning tickets to the cashier and received payment from him. The partnership operated and filed its income tax returns on the calendar year and cash basis. The partnership maintained no books of account, no bank account, and no system of cash control. The accounting records maintained by the partnership were the above-mentioned 20-line sheets; daily summary sheets whereon the day's receipts and expenditures were summarized; accountant's worksheets or spreadsheets whereon the daily summary sheets were summarized by months; a collection of miscellaneous invoices, bills, and receipts; and the tickets on winning bets. The partners did not take an active part in the business operations. Edward Flanagan, who was employed full time by the City of Chicago with hours of duty from eight to four during the years here involved, assisted in the betting operations about three days a week after working hours. Sam English helped out occasionally. *46 Charles English was seldom present. The partnership hired three employees to conduct the business. These three were: Harry Finkelstein, [2] who served as manager and cashier and occasionally as a sheet-writer; William Russo and William Rocco, who served as sheet-writers and performed other miscellaneous duties. All three employees performed duties which included the acceptance of wagers. A large number of partnership's 20-line sheets and betting tickets of winning bettors, and all of the summary sheets, and all other records of its operations in 1949 and 1950 were audited by revenue agents. As a result of their audit, the agents recommended that certain payouts appearing on the 20-line sheets, and other items treated as disbursements, such as an unsubstantiated amount of $100, claimed to have been paid to a lawyer, should be disallowed. They recommended, also, that all of the payouts shown on the summary sheet for one day, April 21, 1949, be disallowed because the 20-line sheets were missing. The results of the agents' audit, item by item, were tabulated in two schedules, one for 1949, and one for *47 1950. These schedules contain the reasons for the agent's recommendation, in each instance, that deductions for payouts should be disallowed for 1949 and 1950. The schedules, exhibits T and U, are incorporated herein by this reference. In the partnership returns for 1949 and 1950, gross receipts, total payouts, gross profits, and net income were shown as follows: 1949
1950
Gross receipts
$422,673.90
$437,148.50
Payouts
392,766.70
413,550.60
Gross profit
$29,907.20
$23,597.90
Total expenses
15,388.55
14,443.30
Net income
$ 14,518.65
$ 9,154.60
On the basis of the agent's audit and report, the Commissioner disallowed deductions for alleged payouts, for 1949 and 1950, in the amounts of $18,597.25 and $12,358.85, respectively. (The latter figure does not include an adjustment of $1,000 for an error in addition of the receipts of the partnership for 1950 which is referred to hereinafter). During 1949 and 1950, the partnership, in the conduct of its business, accepted, roughly, about 300,000 bets for the receipt of which it used, roughly, about 15,000 20-line sheets. Respondent's agents did not check every 20-line sheet. Rather, they made a spot *48 check audit and they scrutinized and carefully examined those 20-line sheets on which the receipts exceeded the payouts. The Commissioner's disallowances of deductions for payouts in 1949 and 1950 relate to about 264 bets in 1949, and to about 97 bets in 1950. The 20-line sheets for 1949 bets, where there are erasures of the footings, the additions of figures, relate to about 242 bets; and for 1950, relate to about 36 bets. In many instances where the footing on a 20-line sheet was erased, it is possible to read some of the outline of the erased figure, and in many instances the new figure written over the erased footing figure is substantially larger than the erased figure. It is also possible, in many of such instances to find on the 20-line sheet, a purported payout in the amount by which the original footing figure was increased. For example, if a footing figure for $68, on a 20-line sheet had been erased, and the new figure which was superimposed was $368, there appeared on the 20-line sheet, above, among the payouts, a purported payout of $300. Examination of the 20-line sheets containing erasures of footing figures and superimposed new figures shows a consistent pattern *49 of alternations of the footing figures on 20-line sheets. It is possible to write in a bet and a payout out of order on a 20-line sheet, i.e., not in accordance with the original position of a betting ticket on a page of tickets. In some instances where erasures and new figures appear at the foot of 20-line sheets, purportedly winning bets were written on a sheet with a different shade of the color of the carbon impression, i.e., over a different carbon paper, and in handwriting which differs from the rest of the writing on the sheet. On some of the 20-line sheets for 1949 and 1950, the number of a horse which lost (opposite a bet written on the sheet) was changed to the number of a horse which won. On various sheets, discrepancies appear as follows: A payout is shown on a horse which did not win; refunds of bets were shown on horses that were not scratched or withdrawn from races; betting tickets were written out of sequence. The Commissioner did not disallow, in every instance, payouts shown on a 20-line sheet containing erasure of the footing figure because in some instances the agents regarded the erasures either as clearly corrections of errors, or the agents resolved *50 the doubts in the partnership's favor. The partnership incurred and paid expenses of operating its business in the taxable years, in addition to the amounts allowed by the Commissioner as follows: 1949
1950
Racing forms, etc.
$2,475.15
$699.75
Supplies
43.35
86.90
Telephone
.68
16.00
Miscellaneous
(not involved)
90.53
$2,519.18
$893.18
The partnership paid rent in 1949 and 1950 in the amounts of $556.50 and $600, respectively. The bookmaking business carried on by petitioners is illegal under the Criminal Code of Illinois, section 336. The owner of the garage in which petitioners carried on their bookmaking business had knowledge that the garage was being used for bookmaking. The employees to whom petitioners paid salaries knowingly assisted in the conduct of petitioner's illegal bookmaking business. The gross receipts of the partnership for 1950 were understated in the partnership return to the extent of $1,000, because of an error in the addition of the gross receipts for the month of April. [3]
*51 The total amounts of payouts by the partnership for 1949 and 1950 were overstated to the extent of $14,941.60 and $6,087.05, respectively. Part of each deficiency for each taxable year is due to negligence. For 1950, all of the petitioners failed to make and file declarations of estimated tax within the time prescribed. Such failure was not due to reasonable cause and was due to wilful neglect. In the instance of each of the petitioners, 80 per cent of the tax exceeds the estimated tax, for 1950. The stipulated facts are incorporated herein by this reference. Opinion HARRON, Judge: Petitioners, Charles English, Sam English, and Edward J. Flanagan, operated a bookmaking business in Chicago as a partnership, each having a one-third interest. The dispute in this case involves determination of the amounts of the partnership's net income for 1949 and 1950. Petitioners contend that the respondent improperly disallowed deductions for certain operating expenses, for salaries and rent, and for certain payouts to allegedly winning bettors. Issue 1: Operating Expenses. The partnership, which reports income on a cash basis, is entitled to deduct business expenses which it incurred *52 and paid during the taxable years. Under this issue consideration is given to the operating expenses which are in dispute, exclusive of rent, which is the subject of Issue 2. Whether or not the partnership is entitled to deductions in the amounts claimed for operating expenses is a question of fact under which petitioners have the burden of proof. The partnership did not maintain a bank account; it made payments for its expenses in cash. Petitioners rely upon the summary sheet records and testimony in support of the partnership's claim for the deductions which are in dispute. The respondent has disallowed for each of the taxable years part of deductions taken for the types of expenses listed below. The respondent's disallowances which are contested under this issue aggregate $3,328.43 for 1949, and $1,592.03 for 1950, as follows: Item
1949
1950
Racing forms, etc.
$2,475.15
$ 699.75
Supplies
852.60
526.65
Telephone
.68
33.70
Miscellaneous
0
331.93
$3,328.43
$1,592.03
Upon consideration of all of the evidence, it is held, and has been found, that the partnership incurred and paid the types of expenses listed above in 1949 and 1950, in the amounts *53 set forth below. The proof relating to each disputed type of expense is not entirely satisfactory and petitioners have failed, in part, in their burden of proof. We have taken into consideration the nature of the business of the partnership and of the types of expenses which are necessary and ordinary in the operation thereof. In determining the amounts of the additional deductions to which the partnership is entitled, it has been necessary to make some approximations of expenses which were paid, bearing heavily against the petitioners for their inexactitude. Cohan v. Commissioner, 39 Fed. (2d) 540. The partnership paid expenses in the amounts listed below, in 1949 and 1950, and, accordingly, respondent erred in not allowing additional deductions totaling $2,519.18 for 1949, and $893.18 for 1950, as follows: Item
1949
1950
Racing forms, etc.
$2,475.15
$699.75
Supplies
43.35
86.90
Telephone
.68
16.00
Miscellaneous
(not involved)
90.53
$2,519.18
$893.18 It follows that, with respect to the above items of expenses, respondent's determinations are sustained to the extent of only $809.25 for 1949, and $698.85 for 1950. Alleged expenditures *54 in the above amounts have not been substantiated. Issue 2: Deductibility of Rent and Wages. The first question under this issue is the amount of rent which was paid by the partnership in each of the years 1949 and 1950. There were deducted in the partnership returns for rent $561.50 for 1949, and $720.50 for 1950. The respondent, in the deficiency notice, allowed deduction for 1949 of $302.50, and disallowed $259; he allowed deduction for 1950 of $205, and disallowed $515.50. What amounts were paid for rent in each of the taxable years is a question of fact. Upon consideration of the evidence it is held, and has been found, that the partnership paid rent in 1949 and 1950 in the amounts of $556.50 and $600, respectively. The next question is whether the partnership is entitled to deductions in the taxable years for rent and wages, or salaries, paid to employees of the partnership. In the deficiency notice the respondent did not question the amounts of the deductions taken in the partnership returns for salaries paid to employees in both of the taxable years. Deductions for their salaries were allowed for each taxable year. By his amended answer, respondent has made the claim that *55 no deduction is allowable for payments for rent and for salaries. Respondent relies upon Sam Mesi, 25 T.C. 513 (on appeal, C.A. 7). The bookmaking business carried on by the partnership is no different from the bookmaking business which was involved in Sam Mesi, supra. Here, as in the Mesi case, the partnership's bookmaking business is illegal under section 336 of the Criminal Code of Illinois. As was observed in the Mesi case, section 336 also makes it a crime for a person to record or register bets or wages, or knowingly permit his owned or leased property to be used or occupied as a gambling establishment. In addition, section 582 of the Criminal Code of Illinois provides that one who aids and abets the perpetration of a crime shall be considered a principal and punished accordingly. These sections of the Illinois code apply to the bookmaking business carried on by the partnership. The evidence establishes, and it has been found, that the landlord who rented premises to the partnership for such illegal operations had knowledge of the purpose for which the premises were being used. There is no evidence that the landlord did not know the nature of the *56 partnership's use of the premises. The evidence also establishes, and it has been found, that the three employees whose salary the partnership seeks to deduct, knowingly recorded and registered bets and wagers, accepted bets and wagers, and generally carried out their duties and rendered such services as to come within the prohibition contained in section 336 of the Criminal Code of Illinois. There is no proof that the three employees did not intend to assist in the commission of illegal acts. The petitioners failed to have any of the partnership's employees or its landlord testify. This failure can only be taken as indicative that their testimony would have been damaging to the petitioners. Mammoth Oil Co. v. United States, 275 U.S. 13. We have previously considered and distinguished G. A. Comeaux, 10 T.C. 201, affd. on a different issue, 176 F. 2d 394, upon which petitioners rely, in Sam Mesi supra, and therefore do not repeat here the reasons why the Comeaux case is distinguishable from this case. In the Mesi case, this Court held that wages, or salaries, were not deductible. In Albert D. McGrath, 27 T.C. - (Oct. 29, 1956), *57 this Court applied the reasoning of the Mesi case and held that payments for rent by a taxpayer who operated a bookmaking business in Chicago, Illinois, were not deductible because, as in the case of payments of wages, such payments violated clearly defined public policy of the State of Illinois. Since this case, under its facts, is not distinguishable from the Mesi and McGrath cases, it is held that the partnership is not entitled to deductions for payments which it made for wages and rents. In so holding, we have not overlooked the decision of the United States Court of Appeals for the Seventh Circuit in Commissioner v. Doyle, 231 Fed. (2d) 635, but, with due respect to that court, we feel that the views expressed in our opinion in the Mesi case are sound and that we should adhere to them. Albert D. McGrath, supra. Petitioners admit that the business of accepting wagers on horse racing is illegal under the laws of Illinois, and that one who knowingly rents to persons engaged in such business, and persons who assist in such business, are subject to the same punishment as the persons conducting the business. It is appropriate to state here, as was said in Albert D. *58 McGrath, supra, " the open question of guilt conjectured in the opinion in the Doyle case is not present here." Issue 3: Disallowed Payouts. The question under this issue is whether the partnership in fact paid in 1949 and 1950, as payouts to winning bettors, $18,597.25 and $12,358.85, all of which the respondent disallowed for lack of substantiation. The accounting records of the partnership for the taxable years consist of the 20-line sheets which are the carbon copies of the betting tickets, on which the amounts paid out to winning bettors were written, and summary sheets of the receipts from bettors and payouts shown on the betting sheets. The partnership retained also the betting tickets returned to it by winning bettors. Such records have been introduced in evidence and have been carefully examined. There are in evidence, also, two exhibits which present in detail each item of payout, and the amount, which respondent disallowed, together with the agents' reasons for each disallowance. These exhibits, Nos. T and U, are too lengthy to set forth in the findings of fact but they have been incorporated by reference. These exhibits have been carefully examined and each item has *59 been compared with the entries on the 20-line sheets and with the betting tickets for winning bets. Much of the record in this case consists of the explanations of an agent of the respondent for the respondent's determinations. Petitioners had the burden of establishing by competent proof that the partnership in fact made the payments of the payouts in 1949 and 1950 in the amounts which have been disallowed. In view of the material presented by the respondent, the petitioners had the opportunity to rebut or disprove the validity of the respondent's disallowances, item by item, of the disputed payouts. However, petitioners did not call as witnesses the sheetwriters employed by the partnership in the taxable years who wrote the 20-line sheets, or any other employee who had first-hand knowledge of the entries on the 20-line sheets from which the summary sheets were made, from which the partnership returns were prepared. The only witness produced by petitioners to give testimony relating to this issue was Flanagan, one of the partners, and he was not able to establish, in our opinion, that all of the determinations of the respondent were in error. In general, petitioners have failed *60 in part to meet their burden of proof and to rebut and overcome the prima facie correctness of the respondent's determinations under this issue. Our examination of the entire record leads us to conclude that respondent properly disallowed payouts in 1949 and 1950 in the amounts of $14,941.60 and $6,087.05, respectively. Accordingly, it has been found that payouts for 1949 and 1950 were overstated in the returns in the above amounts. It is concluded, also, and has been found, that for 1950, respondent properly increased the partnership's net income by $1,000, which represents an error in the addition of receipts from bets. Briefly, disallowance of deductions for payouts in the above total amounts is sustained because petitioners have failed to prove that these alleged payouts were actually paid, or that the partnership paid out the amounts written on the 20-line sheets. Petitioners failed to explain satisfactorily the erasures in the footing figures on a great many 20-line sheets. The evidence shows that on many of the 20-line sheets for 1949 and 1950, the figures for the additions, or footings, of both the ins and the payouts were erased. Flanagan attempted to explain the erasures *61 but his testimony is far from satisfactory and contributes nothing, or very little, to establishing that the disputed payouts were real and accurate rather than fictitious and inaccurate. Flanagan's explanation is that the erasures were made to correct "errors" on the 20-line sheets. Consideration has been given to the explanations of the petitioners but they do not convince us that erasures were merely to correct errors in additions or other possible errors. We have seen all the instances of the erasures; we have analyzed all of the disallowed items and respondent's criticism of them; we have checked an unused 20-line sheet with tickets attached; we have made comparisons of the entries on the 20-line sheets for the disallowed payouts with allowed payouts. Upon making a complete and thorough check of respondent's determinations, in the light of the entire record, it is our opinion that alleged payouts in 1949 and 1950 in the total amounts of $14,941.60 and $6,087.05, respectively, have not been shown by petitioners to have been bona fide and true. Also, some of the disallowed payouts, included in the above totals, represented clear mistakes. Examples of these errors are as follows: *62 There are instances where, on 20-line sheets, the number of a horse was changed from a loser to a winner; a payout for a win was shown on a losing horse; refunds were shown on horses not scratched; there was a discrepancy between the horse number shown on a betting ticket and on a 20-line sheet; there was an instance of a change of a single bet to a parlay. It is held that respondent properly disallowed payouts in 1949 and 1950 in the above-stated amounts. On the other hand, some of the respondent's disallowances should not be sustained and his disallowances of payouts for 1949 and 1950 are overruled in the amounts of $3,655.65 and $6,271.80, repectively, for the following reasons. For 1949, respondent disallowed all of the payouts for one day, as shown in the monthly summary sheet, because petitioners could not produce the 20-line sheets for that day's business. Respondent, in all instances, accepted the figures shown in the summary sheet for the ins. His unwillingness to accept the figure on the summary sheet for payouts for one day is unreasonable when the stated payouts for the one day of missing 20-line sheets is considered along with the records for payouts during the month *63 involved. Another category of disallowed payouts is not found to be clearly in error or fictitious. To sustain respondent's disallowances of the payouts in this class would involve giving more weight to suspicion than to proof. There are 2 minor items which are satisfactorily explained by reference to the 20-line sheets. Issue 4: Additions under sections 293(a) and 294(d), 1939 Code. It is clearly established that part of each deficiency is due to negligence. The additions under section 293(a) for 1949 and 1950 are sustained. The additions under section 294(d) relate to 1950, only. Additions have been made under sections 294(d)(1)(A) and 294(d)(2). Petitioners failed to file any declarations of estimated tax for 1950 and they have not shown that such failure was due to reasonable cause and not to wilful neglect. The penalties determined under section 294(d)(1)(A) are sustained. Since petitioners did not file declarations of estimated tax for 1950, it follows that 80 per cent of the tax exceeds the estimated tax. The additions under section 294(d)(2) are sustained. Decisions will be entered under Rule 50. Footnotes
1. Consolidated with Docket No. 55907, Charles English and Lorraine English, are the following: Docket No. 55908, Sam English and Mary English; Docket No. 55909, Edward J. Flanagan.↩
2. Harry Finkelstein is frequently referred to in the record as Mr. Fink.↩
3. This item is noted apart from the question of whether the amount of payouts in 1950 was overstated in the partnership return. The Commissioner determined that the total amount of payouts for 1950, in the return, was overstated to the extent of $13,358.85, which figure includes the mathematical error of $1,000 in the amount of gross receipts for 1950.↩