**Joe W. STOUT and Eudora H. Stout, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 7892.

United States Court of Appeals Fourth Circuit.

Argued Oct. 12, 1959.

Decided Dec. 29, 1959.

N. A. Townsend, Jr., and Herman Wolff, Jr., Raleigh, N. C. (J. O. Tally, Jr., Fayetteville, N. C., Poyner, Geraghty, Hartsfield & Townsend, Raleigh, N. C., and Tally, Tally & Taylor, Fayetteville, N. C., on the brief), for petitioners.

Rita E. Hauser, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Dept of Justice, Washington, D. C., on the brief), for respondent.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

Whether the taxpayers received a constructive dividend is the principal question. The Tax Court resolved it against the taxpayers upon a determination that the taxpayers had failed to prove that they had not received such a dividend. We think the case must be reversed upon the ground that the Commissioner has failed to prove that they did.

I.

The taxpayer, Joe W. Stout, was the owner of 63 shares of the common stock of Southern Builders, Inc., a North Carolina corporation organized in 1948 and engaged in the construction business in Fayetteville, North Carolina. The remainder of the 139 shares, which were issued and outstanding until July or August 1951 were owned, 70 by one Zeigler and 6 by one Crowell. In 1949 the same individuals organized another corporation, Elliott Homes, Inc., to build and operate a housing project in Fayetteville, to be financed by an FHA loan. They subscribed to shares of $100 par value common stock of Elliott Homes, Inc., in substantially the proportions in which they owned the stock of Southern. Stout subscribed to 161 such shares, Zeigler to 183, and Crowell to 14, so that their subscription obligations aggregated $35,800, no part of which was ever paid by either of them. The subscription obligation, however, was shown on the books of Elliott as an account receivable of $35,800.

Notwithstanding the fact that the subscription price for the Elliott stock had not been paid, the stock was actually issued as of January 1, 1950 to the subscribers in accordance with their subscriptions, and each of the three certificates was then endorsed in blank by its registered owner and deposited with Seaboard Surety Company. Seaboard was the surety upon construction bonds given by Southern. It took a pledge of the Elliott stock as security for the personal indemnity of the Southern stockholders, requirements which it imposed as conditions of its undertakings.

Southern undertook to, and did, construct the buildings and real estate improvements for Elliott. FHA required of Elliott certain off-site construction work which had not been contemplated, as a result of which the completed project cost some $42,000 more than the proceeds of the FHA loan. Having no assets other than the real estate and the receivable for the subscription price of its stock, Elliott was unable to pay all of its indebtedness to Southern. This situation led the individuals to a decision that the Elliott stock should be assigned to Southern, and that Southern should assume and pay their subscription obligations. This is shown by a journal entry in Elliott's books of a credit to accounts receivable of $35,800, offsetting the previous entry to record the unpaid subscription price of the stock, and of a debit in the same amount to vouchers payable. Elliott's journal entry includes an explanation that it is to record an exchange of stock as partial payment on the balance it owed Southern.[1]

Appropriate entries were also made in Southern's journal. A debit of $35,800 was made to a new account, Investments—Elliott Homes, Inc., while a credit in the same amount was made to accounts receivable. An explanation was inserted that it was done to record the purchase of Elliott's stock by a reduction of the balance due from Elliott on the construction contract.[2]

The exact time of the agreement to transfer the Elliott stock to Southern is uncertain. The entry in Southern's journal to record the transaction was made as of February 28, 1951, the close of its fiscal year, while that in Elliott's journal was made as of July 31, 1951, the close of its fiscal year. The testimony indicates that each entry was made by the accountant at the time of an annual audit, and, with other closing entries, was probably put on the books some time after the date actually shown.

For several months after April 1951, Zeigler was confined to a hospital as a result of injuries he received in an accident. He was also having marital difficulties and was concerned with his personal liability as Seaboard's guarantor on Southern's performance bonds. There were several conferences between the parties, culminating in an agreement on July 13, 1951 for an exchange of stock, so as to vest all of the outstanding stock of Elliott in Zeigler and Crowell, leaving the taxpayer, here, as the sole stockholder of Southern.

1. The entry on Elliott's journal is in the following language:

|  | Debit | Credit |
|---|---|---|
| 7/31/51—Vouchers Payable | $35,800 | |
| Other a/c receivable | | $35,800 |
| To record exchange of stock as partial payment on balance due Southern Builders on contract. | | |

2. The entry on Southern's journal is in the following language:

|  | Debit | Credit |
|---|---|---|
| 2/28/51 Investments—Elliott Homes, Inc. | $35,800 | |
| Accounts Receivable | | $35,800 |
| To record purchase of stock of Elliott Homes, Inc., by a reduction of the balance due on contract. | | |

Seaboard had been consulted about the several transactions affecting the Elliott stock which it held as collateral for the personal obligations of the taxpayer, Zeigler and Crowell to it. Obviously, if the new purpose and agreement of the individuals was to be consummated, it was necessary to obtain a release of the Elliott stock by Seaboard. Seaboard did release the Elliott stock sometime prior to August 22, 1951, for on that date the old certificates were cancelled on Elliott's stockbook and two new certificates were issued by Elliott, one for 332.56 shares to Zeigler and one for 25.44 shares to Crowell.

The second transaction regarding Elliott's stock was recorded in Southern's journal by a closing entry made as of February 28, 1952, the close of its fiscal year. It shows a debit of $35,800 to its treasury stock and a credit of the same amount to its "Investments—Elliott Homes, Inc." The explanation in the journal is that the entries were made to record an exchange of 358 shares of the Elliott stock for 76 shares of Southern stock, 70 being acquired from Zeigler and 6 from Crowell.[3]

The journal entries clearly reveal a purchase by Southern, from its stockholders, of the Elliott stock and a payment of the subscription price by Southern through a reduction of its claim against Elliott, while Elliott showed the payment of the subscription price of its stock by a reduction of its account payable to Southern. Consistently, the Elliott stock was then shown as an investment of Southern's. The second transaction was clearly shown by Southern's journal entry to have been a transfer by it of 358 Elliott shares to Zeigler and Crowell in exchange for 76 shares of Southern stock, which was then appropriately shown as being held in Southern's treasury. Nevertheless, the Commissioner assessed deficiencies to the taxpayer based upon the theory that these transactions resulted in a taxable dividend to the taxpayer in the amount of $16,100. His contention is that the taxpayer never transferred his 161 shares of Elliott stock to Southern, that Southern paid his subscription price for him, not for itself, and that, thereafter, the taxpayer transferred his 161 shares of Elliott stock to Zeigler and Crowell in exchange for their 76 shares of Southern stock. The Commissioner's theory, of course, is in direct conflict with the journal entries.

The Commissioner seeks to support this contention by the fact that Elliott's stockbook does not show the transfer of Elliott shares to Southern and the subsequent transfer of those shares by Southern to Zeigler and Crowell. The original certificates, representing Elliott stock, were simply cancelled on August 22, 1951 and two new certificates issued to Zeigler and Crowell. The three original certificates, endorsed in blank, were in New York in possession of Seaboard until shortly before August 22, 1951, however, and they could not have been transferred of record on Elliott's stockbook contemporaneously with the assignment of the stock interests of the three original stockholders to Southern. When the certificates were returned, the correct procedure, unquestionably, would have been then to issue a certificate for all of the outstanding shares in Southern's name, obtain its endorsement on the new certificate, and, thereupon, issue such shares to Zeigler and Crowell, in which event a full record of the transaction would have appeared on Elliott's stockbook. It is well-known, however, that

---

3. This entry in Southern's journal is in the following language:

|  |  | Debit | Credit |
|---|---|---|---|
| 2/28/52 Treasury Stock |  | $35,800 |  |
| Investment-Elliott Homes, Inc. |  |  | $35,800 |
| To record exchange of 358 shares of Elliott Homes, Inc., stock as follows: |  |  |  |
| H. J. Zeigler | 70 Shares |  |  |
| W. W. Crowell | 6 Shares |  |  |

small corporations frequently transfer stock endorsed in blank to its bearer, even though the corporation or its officers have reason to believe there has been an intermediate transfer from the registered owner. The failure of Elliott's stockbook to disclose the entire transaction may warrant further inquiry, but it falls far short of proof that the journal entries were fictitious.

The Commissioner points to the fact that the minutes of a special meeting of the stockholders of Southern, held on August 22, 1951, report that the taxpayer stated that all of the Southern stock previously owned by Zeigler and Crowell had been transferred and assigned to him, and to the fact that Southern's balance sheet attached to its income tax return for the fiscal year 1951 did not show the Elliott stock as an asset, and discloses accounts receivable $35,800 greater in amount than they would have been if the journal entry of February 28, 1951 had been properly reflected in the balance sheet. The Commissioner also points to the fact that, while in the proceedings before the Tax Court Crowell described the transaction consistently with the journal entries, the taxpayer, who appeared inexperienced in finance and corporate transactions and confused by the examination, at one time testified that he did not know by whom the Elliott shares were owned in the summer of 1951.

These matters may cast some suspicion upon the journal entries, but it is not surprising that one inexperienced in corporate affairs, who had become the owner of all the outstanding stock of a corporation when that corporation acquired all of its stock outstanding in the hands of its other stockholders, should have referred to the transaction as an acquisition by him of the other stock,[4] or that the same stockholder should have become confused, as he did, when pressed on cross examination as to whether he or Southern was the legal owner of the Elliott stock at any particular time. It is quite possible also that Southern's balance sheet as of February 28, 1951 was prepared prior to the time the closing journal entries of that date were actually made. If it remained uncorrected, after the completion of the closing entries, the failure to correct it did not affect in any way Southern's tax obligations.[5]

The sum of these matters appears to us ground for inquiry about the validity of the journal entries, but falls short of destroying their evidentiary persuasiveness. Though these journal entries were probably made some weeks or months after the closing dates they bear, they certainly were made long before this tax controversy arose. The journal entries were made under the direction of a certified public accountant, who had been consulted by the parties at the time of each transaction, and when he made the journal entries he must have had actual knowledge of what had occurred. There is no reason to suppose the transactions in July or August 1951 would suggest to him that the method of handling the previous transaction should be altered or misrepresented, for if Southern had paid the stock subscriptions of its stockholders and the stockholders had remained the owners of the Elliott stock, a taxable

---

4. Southern's attorney testified that he prepared these minutes in his office, that the statement was his, rather than the taxpayer's. He further testified that the statement was in error, for he knew, at the time, that Southern, not the taxpayer, had acquired the Southern stock previously owned by Zeigler and Crowell. The statement in any event clearly appears inconsistent with all of the records. Certificates representing such stock were never issued to taxpayer. Southern's books record such stock as owned by it and held in its treasury.

5. The Commissioner's position is founded upon the fact that Southern did pay the subscription price of the Elliott stock by a reduction of its claim against Elliott as shown by the journal entries. His reference to the discrepancy between the journal entries and the balance sheet of February 28, 1951 is not for the purpose of raising doubt whether Southern paid the subscription price, but rather to suggest that the payment may have been agreed upon during 1951 but after the date the journal entry bears.

dividend would have been paid at that time and could not have been undone by any subsequent transaction between the corporations or their stockholders. What was subsequently done, as shown by the journal entry of February 28, 1952, was consistent with the journal entries made to close the books of Southern and Elliott for the preceding fiscal years, but the decision of the taxpayer, on the one hand, and of Zeigler and Crowell, on the other, to go their separate ways had no bearing whatever upon the tax consequence of the previous transaction. It was obvious during the fiscal year 1951 that if the technical incidence of a taxable dividend was to be avoided when Southern reduced its account receivable from Elliott by an amount equal to the subscription price of Elliott's stock, the Elliott stock would have to be transferred by the stockholders to Southern. Nothing which thereafter occurred would alter that situation or make applicable any new consideration. Furthermore, an assumption that the journal entries were fictitiously made for the sole purpose of disguising the transaction, suggests that persons so motivated would have gone the final step and made consistent fictitious entries in the stockbook of Elliott.

The Tax Court held that the taxpayer had failed to prove that Southern became the owner of the Elliott stock or to overcome the presumption of correctness which ordinarily arises upon the Commissioner's finding.

■ The presumption of correctness is procedural. It transfers to the taxpayer the burden of going forward with evidence, but it disappears in a proceeding to review the assessment when substantial evidence contrary to the Commissioner's finding is introduced.[6] Thereafter, the Tax Court, in such a proceeding, must make its own findings based upon the evidence before it, and we may affirm only if the findings of the Tax Court are supported by substantial evidence in the record of that proceeding.[7]

Here the taxpayer offered the entries in the journals of Southern and Elliott which show Southern's acquisition of the Elliott stock and the subsequent transfer of that stock by Southern to Zeigler and Crowell. In addition, there was the testimony of witnesses, particularly Crowell, which support the journal entries.

Against this very substantial evidence, which was more than sufficient to dissolve the presumption that the Commissioner's contrary finding was correct, the Commissioner offered nothing which can be said to affirmatively show that Southern was not the owner of the Elliott stock when it paid the subscription price. The fact that the stock was not then registered in Southern's name might be, under some circumstances, some evidence that it was not owned by Southern, but this was more than fully met by the showing that the stock was pledged and unavailable for transfer.

The only other circumstances upon which the Commissioner relies, as we have seen, may be said, at most, to warrant further inquiry into the facts represented by the journal entries. That further inquiry discloses no evidence that the taxpayer, at any time after February 28, 1951, dealt with any of the Elliott stock as owner or in any way acted as, or represented himself to be, an Elliott stockholder. On the contrary, it affirmatively appears that Southern was then carrying all of the Elliott stock on its books as its asset and that, in the summer of 1951, it exchanged the Elliott stock for 76 shares of its own stock. Southern still holds in its treasury the 76 shares of its stock thus acquired, and there is no evidence that these shares were ever registered in the name of the

6. Manchester Board & Paper Co. v. Commissioner, 4 Cir., 89 F.2d 315; Clark v. Commissioner, 9 Cir., 266 F.2d 698; Cohen v. Commissioner, 9 Cir., 266 F.2d 5; Niederkrome v. Commissioner, 9 Cir., 266 F.2d 238.

7. Clark v. Commissioner, 9 Cir., 266 F.2d 698; Cohen v. Commissioner, 9 Cir., 266 F.2d 5.

taxpayer or were outstanding after the date of the exchange.

What the parties did was entirely consistent with the journal entries. The Commissioner, of course, insists, as the journal entries show, that Southern paid the subscription price of the Elliott stock. His attack on the journal entries is limited to their representation that Southern acquired the Elliott stock at or about the time it paid the subscription price. If Southern was to pay the subscription price, the natural thing was for it to acquire the stock. If any other course was pursued, it appears in this record only as a matter of speculation.

■ Book entries are not necessarily conclusive proof of the facts they represent. When made substantially contemporaneously with the events and long before any tax controversy arises, as these were, they are entitled to great weight. When the conduct of the parties is shown to be consistent with the book entries, there is no justifiable basis for findings in conflict with their disclosure.[8] At least, a contrary finding, on this record, cannot be said to rest upon substantial evidence.

■ We conclude that there was no constructive dividend within the meaning of § 115(a), Internal Revenue Code of 1939.[9]

## II.

As an alternative, the Commissioner contends that when Southern exchanged the Elliott shares it owned for the Southern stock of Zeigler and Crowell, a constructive dividend was paid to the taxpayer, within the meaning of § 115(g), Internal Revenue Code of 1939.[10] The Elliott stock had a cost basis in Southern's hands of $35,800, and the Commissioner contends that the taxpayer received a constructive dividend in that amount.

The Elliott stock, of course, was sold by Southern to Zeigler and Crowell for a valuable consideration. It was not distributed to the taxpayer. The taxpayer would derive economic advantage from the transaction only if the Elliott stock was worth less than the 76 shares of Southern stock for which it was exchanged. Zeigler and Crowell must have thought it was not, for they participated voluntarily in the exchange under circumstances which contain no suggestion they intended to donate anything to the taxpayer or to Southern.

This then is the bare case of redemption by a corporation of its stock in the hands of some, but not all, of its stockholders. There are no special circumstances to support an inference that the remaining stockholder received a dividend as a result of the exchange to which he was not an immediate party. He had no pre-existing obligation to purchase the Zeigler and Crowell stock.[11] He has exchanged nothing; he has sold nothing; he has been relieved of no obligation. There is not even evidence which would support a finding that the sales value of his unsold stock was greater after the exchange than before.

If the taxpayer had been so misadvised as to purchase the Southern stock of Zeigler and Crowell, using funds supplied by Southern, he would have received a taxable dividend. The tax would have been imposed not because its imposition was equitable or reasonable, and despite the fact that the transaction, viewed as a whole, may have been to his economic detriment rather than to his economic advantage.[12] It would have been imposed because of the form of the transaction, a distribution of corporate assets to a stockholder without an adequate consideration flowing to the corporation.

Here the distribution of corporate assets was not to the remaining stockhold-

---

8. Gordon v. Commissioner, 3 Cir., 268 F. 2d 105.

9. 26 U.S.C.A. (I.R.C.1939) § 115(a).

10. 26 U.S.C.A. (I.R.C.1939) § 115(g).

11. See Wall v. United States, 4 Cir., 164 F.2d 462.

12. It would be to his economic detriment if the price paid was greater than the value of the stock.

er, and there was an adequate consideration flowing to the corporation. If another transaction by which the parties might have come to substantially the same end would have resulted in tax liabilities because of the form in which it was cast, there is no reason to hold taxable a transaction cast in nontaxable form when the substantive bases of taxation are absent.

■ We find in the record no basis for findings which would support a conclusion that the redemption of the Zeigler and Crowell stock resulted in a constructive dividend to the taxpayer. Holsey v. Commissioner, 3 Cir., 258 F.2d 865.[13]

### III.

■ For failure to file the required declarations of estimated tax, the Commissioner assessed the penalty under § 294(d) (1) (A),[14] and, in addition, the penalty for substantial underestimation of tax under § 294(d) (2).[15] The Tax Court sustained the determination of the penalty for underestimation in accordance with its previous decisions and those of several Courts of Appeals.[16] The Court of Appeals for the Sixth Circuit took the opposite view,[17] and its decision has now been affirmed by the Supreme Court.[18]

It is now settled that imposition of the penalty under § 294(d) (2) was improper.

The taxpayer had taxable income in 1951. A penalty under § 294(d) (1) (A) was properly imposed, but must be recomputed in the light of our disposition of the issue as to the taxpayer's income tax liability. For a redetermination and assessment of that penalty, the case will be remanded to the Tax Court.

Reversed and remanded.

---

13. On October 30, 1958, the Commissioner announced that the Internal Revenue Service will follow the decision in Holsey in similar factual situations. TIR 109, IRB 1958–43.

14. 26 U.S.C.A. (I.R.C.1939) § 294 (d) (1) (A).

15. 26 U.S.C.A. (I.R.C.1939) § 294(d) (2).

16. Abbott v. Commissioner, 3 Cir., 258 F. 2d 537; Patchen v. Commissioner, 5 Cir., 258 F.2d 544; Hansen v. Commissioner, 9 Cir., 258 F.2d 585.

17. Acker v. Commissioner, 6 Cir., 258 F. 2d 568.

18. Commissioner v. Acker, 80 S.Ct. 144.