Barnes Theatre Ticket Service, Inc. [1] v. Commissioner. Barnes Theatre Ticket Service, Inc. v. Commissioner
Docket Nos. 1210-64 - 1212-64.
United States Tax Court
T.C. Memo 1967-250; 1967 Tax Ct. Memo LEXIS 11; 26 T.C.M. (CCH) 1290; T.C.M. (RIA) 67250; December 18, 1967
*11 Held: 1. Petitioner has failed to prove that its costs of operations for the years 1955 through 1958 exceeded the amounts allowed by the Commissioner. 2. Petitioner has proved that it did not receive income on sales made to other ticket brokers during such years. 3. A withdrawal of funds by Florence M. Barnes from the corporation in 1958 constituted the repayment of funds previously loaned by her to it. George D. Crowley and Gerald C. Risner, for the petitioners. Helen Viney Porter and George T. Donoghue, Jr., for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: The respondent determined deficiencies in income tax of the petitioners and additions to the tax as follows: Additions
Petitioner
Year
Deficiency
to the tax [2]
Barnes Theatre Ticket Service, Inc.
1955
$32,763.18
Barnes Theatre Ticket Service, Inc.
1956
33,295.98
Barnes Theatre Ticket Service, Inc.
1957
11,175.89
Barnes Theatre Ticket Service, Inc.
1958
11,428.55
Florence M. Barnes
1953
7,162.01
$ 358.10
Florence M. Barnes
1955
14,503.54
725.18
Florence M. Barnes
1956
44,584.03
2,655.00
Florence M. Barnes
1957
15,561.75
778.09
Florence M. Barnes
1958
36,892.42
1,844.62
Albert C. Eckardt and Cassandra Eckardt
1955
38,377.84
1,918.89
Albert C. Eckardt and Cassandra Eckardt
1956
28,769.98
1,440.17
Albert C. Eckardt and Cassandra Eckardt
1957
8,698.23
434.91
Albert C. Eckardt and Cassandra Eckardt
1958
5,978.14
298.91
*12 The respondent's adjustment of income tax of Florence M. Barnes for the year 1953 was the result of the elimination of a net operating loss reflected on her return for 1955. Part of the adjustments in income tax of Barnes Theatre Ticket Service, Inc., for the years 1955 and 1958 was the result of the elimination of net operating losses reflected on its returns for the years 1955 and 1956. The validity of these adjustments depends upon our decision as to other issues in the case, and such adjustments shall be taken care of in the Rule 50 computations. There are basically three issues for decision. First, whether Barnes Theatre Ticket Service, Inc., overstated its costs of operations for the taxable years 1955, 1956, 1957, and 1958. Second, whether Barnes Theatre Ticket Service, Inc., realized gross income from sales to other ticket brokers in the taxable years 1955 through 1958. Third, whether a payment by Barnes Theatre Ticket Service, Inc., to Florence M. Barnes in 1958 is taxable to her as a dividend or whether such payment was in *13 repayment of a loan previously made by her. Findings of Fact Some of the facts were stipulated, and those facts are so found. Barnes Theatre Ticket Service, Inc. (Barnes), is a corporation with its principal place of business during the years 1955 through 1958, and at the time its petition was filed in this case, at Chicago, Illinois. Florence M. Barnes (Florence) is an individual who resided in Chicago, Illinois, during the years 1953 and 1955 through 1958 and at the time her petition was filed in this case. Albert C. Eckardt (Albert) and Cassandra Eckardt are individuals who resided in Northbrook, Illinois, during the years 1955 through 1958. All of the petitioners filed their Federal income tax returns for the years at issue in this case withthe district director of internal revenue, Chicago, Illinois# Barnes was incorporated under the laws of the State of Illinois on January 1, 1947. Its paid-in capital at the date of incorporation was $15,000. Florence, since the date of incorporation, has been the sole stockholder of Barnes. The officers of Barnes for the years 1955 through 1958 were Florence, President; Albert, Treasurer; and David Basofin, Vice-President. Barnes is *14 engaged in the business of reselling tickets for profit. It delivers to its customers tickets or cards of admission to theatres, operas, movies, sporting events, and other places of amusement at a charge in excess of established box office prices. This business is commonly known as that of a ticket broker. During the years 1955 through 1958, Barnes purchased tickets for resale from the box offices of various theatres and sporting arenas and from persons or organizations engaged in the production of various theatrical and sporting events. Barnes also purchased tickets by mail and from other people not regularly engaged in the business of selling tickets. During the years 1955 through 1958, Barnes' principal office was located at the Palmer House Hotel. It was from this office that the purchase and sale of all tickets was controlled, and it was here that Florence, Albert, and Anne Magner (Anne), the bookkeeper, were located. Tickets were sold from a counter adjacent to the corporate offices in the Palmer House and from stands in a number of hotels and private clubs in the Chicago area. Each day, the main office of Barnes received from each of the stands a sheet showing the date, *15 the number of tickets sold by the stand, the number of tickets returned, the amount of money received, the customer's name, the theatres to which the tickets applied, and an inventory of tickets. The sheets did not show any amounts described as the cost of the tickets to Barnes or the premium over established box office price, if any, that Barnes paid for the tickets. The proceeds of the day's sales accompanied the sheets from each stand. The proceeds were then checked with the sheets and entered in Barnes' Cash Receipts book. Check proceeds from sales were deposited in Barnes' bank account, and currency was either deposited in the bank or maintained in the office safe as an operating fund. Box office personnel located in various theatres and sporting arenas selected choice seat locations for each attraction being shown and sent the tickets of admission for such seats to the Palmer House office of Barnes or requested that its messenger pick them up at the box office. When Barnes received tickets from the treasurers of the various box offices, included with the tickets was a slip of paper showing the cost per ticket, the number of tickets purchased, and the amount of premium, if any, *16 over the box office price paid by Barnes. After recording some of this information in the books and records, Anne destroyed the slip of paper. Box office personnel allowed Barnes to return tickets for full refund prior to the time of the performance. At the end of each month, the daily sheets received from Barnes' various stands were "recapped", or summarized, by Anne. She then made quarterly recaps from the monthly recaps which were used as a basis for computing sales in the preparation of Barnes' Federal excise tax returns. The sales figures on the quarterly recaps did not represent total sales but only those sales on which an excise tax was due. For the year 1955, cash purchases by Barnes per week per theatre or event were recorded in its Cash Receipts book. For the years 1956, 1957, and 1958, total cash purchases for periods varying from one to several weeks were recorded in the Cash Receipts book. Although most purchases were paid for by cash, some were paid for by check. The amounts of such checks were recorded for the years 1955 through 1958 in the Cash Disbursements book. The number of tickets purchased and sold by Barnes can be computed only from the daily sheets that *17 the various stands kept; no totals or recaps were maintained by Barnes showing the total number of tickets purchased or sold during a particular year. The books and records of Barnes do not include any original entries as to the costs of individual tickets purchased and the names of persons from whom purchases were made. On occasions when the current operating funds of Barnes were insufficient to pay for cash ticket purchases, Florence supplied funds to enable it to make such purchases. On Barnes' books, these funds advanced by Florence were treated as loans. The following schedule shows totals taken from its books regarding the funds advanced by Florence during the years 1954 through 1958 and the repayments to Florence: Advanced by
Repaid to
Year
Florence
Florence
1954
$ 6,000.00 $0
1955
31,200.00
640.66
1956
28,350.00
29,000.00
1957
12,000.00
7,800.00
1958
0
40,109.34
$77,550.00
$77,550.00
Barnes' books do not, for the most part, reflect the dates funds were advanced or the amount of funds advanced by Florence on such dates; rather, the book entries regarding such funds appear to be year-end summaries of various transactions that took *18 place during the year. During the years 1955 through 1957, Barnes received bundles of tickets from various box offices for transmittal to other ticket brokers. Each bundle of tickets was accompanied by a slip of paper indicating the ticket broker to whom such tickets were to be transmitted and the amount of money to be paid to each box office for such tickets. The ticket broker, upon his receipt of the tickets, paid Barnes for the tickets, and Barnes in turn paid the box office from which the tickets came. There is no record in Barnes' books of the acquisition of any large capital assets or of the payment of any dividends to Florence or Albert in any of the years 1955 through 1958. On its returns, Barnes reported gross receipts of $752,357.57 for the taxable year 1955, $675,900.60 for 1956, $592,502.50 for 1957, and $737,959.74 for 1958. Barnes reported total costs of operations of $569,785.75 for 1955, $499,164.30 for 1956, $391,912.95 for 1957, and $475,372.89 for 1958. The respondent disallowed as costs of operations $70,775.14 for 1955, $62,713.02 for 1956, $21,835.89 for 1957, and $14,443.24 for 1958. Barnes' books and records show that it purchased tickets for transmittal *19 to other ticket brokers in the amounts of $58,205.45 for the taxable year 1955, $83,877.30 for 1956, $19,056.70 for 1957, and $8,493.80 for 1958. The books and records further show that Barnes' sales to other ticket brokers for the taxable years 1955 through 1958 were in the same amounts as its purchases, resulting in no income to Barnes. The respondent in his determination reduced the amounts of Barnes' purchases for sale to other ticket brokers to $48,504.54 for the taxable year 1955, $69,897.75 for 1956, $15,880.59 for 1957, and $7,078.17 for 1958. Opinion The major issue in this case is the amount of Barnes' costs of operations for the years 1955 through 1958. In the first place, Barnes challenges the validity of the notice of deficiency. In the notice, the respondent set forth that he was disallowing a portion of the costs of operations for lack of substantiation, but the respondent did not indicate how he arrived at that portion. Barnes contends that such a notice is insufficient to give rise to a presumption of correctness. However, we believe that the notice is sufficient to be entitled to the presumption of correctness. See, Commissioner v. Stewart, 186 F. 2d 239 *20 (C.A. 6, 1951), revg. on other grounds a Memorandum Opinion of this Court; Albert D. McGrath, 27 T.C. 117 (1956). Cf., Marx v. Commissioner, 179 F. 2d 938 (C.A. 1, 1950), affg. a Memorandum Opinion of this Court, cert. denied 339 U.S. 964 (1950); Estate of Peter Finder, 37 T.C. 411 (1961). In so holding, we are not approving of the deficiency; we are merely saying that the notice of deficiency is sufficient to raise the presumption of correctness and to place the burden of proof on the petitioners. Barnes also raises an issue as to the effect of such presumption. The language sometimes used in discussing the presumption may be confusing, but clearly, the petitioner has the responsibility of persuading us that the asserted deficiency is erroneous or arbitrary. Welch v. Helvering, 290 U.S. 111 (1933); Archer v. Commissioner, 227 F. 2d 270 (C.A. 5, 1955), affg. a Memorandum Opinion of this Court; Duquesne Steel Foundry Co., 15 B.T.A. 467 (1929), affd. per curiam 41 F. 2d 995 (C.A. 3, 1930), affd. per curiam 283 U.S. 799 (1931). The decisions which appear to contain inconsistent *21 language as to the procedural aspects of this rule do not affect the validity of the rule. Compare United Aniline Company v. Commissioner, 316 F. 2d 701 (C.A. 1, 1963), affg. a Memorandum Opinion of this Court, with Stout v. Commissioner, 273 F. 2d 345 (C.A. 4, 1959), revg. a Memoranum Opinion of this Court. To prevail, Barnes need not establish the amount of its tax liability. Helvering v. Taylor, 293 U.S. 507 (1935). It can succeed by showing that the asserted deficiency was computed in an improper manner or by showing that its books and records are adequate and accurately reflect its income, or by producing a combination of such evidence. H. T. Rainwater, 23 T.C. 450 (1954); Morris Nemmo, 24 T.C. 583 (1955). Barnes has adduced no evidence as to the manner in which the respondent computed the asserted deficiency; instead, it rests its case on an attempt to show that its books are reliable and correctly reflect its income. In its Cash Receipts book and its Cash Disbursements book, the entries for 1955 merely show the total amount spent for the purchase of tickets at a particular theatre or box office over a period *22 of a week or more. For the later years involved in this case, the Cash Receipts book does not even show the theatre or box office at which the tickets were purchased. The invoices which accompanied the purchases have been destroyed. Except for the recaps for 1957, there are generally no entries showing the names of the persons from whom tickets were purchased, the dates of the purchases, and the amounts paid for particular tickets or groups of tickets. Although the recaps for 1957 include some of such information, it is not clear how they were prepared; they were apparently prepared from the daily reports from the stands, and not from the invoices accompanying the purchases. We find these books and records to be inadequate to establish Barnes' costs of operations. In view of the destruction of the invoices, there is no way of verifying the correctness of the totals. Jack Showell, 23 T.C. 495 (1954), remd. on other grounds 238 F. 2d 148 (C.A. 9, 1956). Moreover, in this case, we do not have supporting testimony of the nature provided in the Rainwater and Nemmo cases, supra. In those cases, the testimony established a convincing chain of evidence. The Court *23 was told how the original entries were prepared, how they were copied on to a summary, and how that summary was transferred to other books. In addition, the books and summaries were then used as a basis for a business decision: In the Rainwater case, a division of partnership profits was predicated on the books and summaries; in the Nemmo case, substantial amounts of operating cash were given to an employee on the basis of the books and summaries. Thus, if the Court found the testimony credible, it then followed that the summaries should be reliable. In the case before us, we are merely told that Anne copied the invoice information and then destroyed them. We are not told on what documents she copied the information; we are not told how she computed the totals which were included in the books; we are not told how she arrived at the figures which appear in the recaps; and we have not been shown that any business decisions were based upon the books and records. Under such circumstances, we have little to convince us that the totals are reliable. Finally, a very dark cloud is cast on the reliability of the cost information in the books by statements which Florence made to the agent *24 of the respondent during the investigation of the tax liabilities of Barnes. According to the agent, Florence told him that the records of Barnes did not reflect the true cost of the tickets. She stated that the figures for purchases in the books also included other costs, and that she would give Anne the figures for costs of tickets to place in the books. She also stated that she made payments to State legislators to prevent the passage of unfavorable legislation, and that such payments were included on the books and records of Barnes in the figures for purchases. Barnes' counsel objected to the admission of this testimony claiming that it was inadmissible hearsay. According to his argument, the agent was engaged in an excise tax liability investigation, and since the admissions were made in connection with that investigation, they were not admissible in an income tax controversy. However, we have concluded that the testimony as to Florence's statements is admissible. It is not clear whether the investigation was confined to excise tax liability, and even if it was so limited, such fact does not prevent the admission of the statements in this income tax proceeding. Her statements *25 are clearly relevant to this controversy, and the reasons for allowing the admission of such statements are all present. Florence cannot complain that her statements to the agent were not trustworthy, nor can she object to their admission because of a lack of opportunity for cross-examination. See McCormick, Evidence, pp. 502-504 (1954). Florence's statements constitute additional reasons for doubting the reliability of the cost information contained in the Barnes' records. See, Albert D. McGrath, supra. Florence, although she was at the trial, did not take the stand, and no effort was made to explain away the doubts raised by her statements to the agent. Frankly, we realize that Barnes' failure to keep better records may have been innocent and that the consequence of our conclusion imposes a heavy tax burden on Barnes. Yet, the corporation was engaged in a large business, and inasmuch as the business involved largely cash transactions, it seems that Barnes should have recognized the necessity of keeping more complete records. In view of the failure to retain the records necessary to enable a verification of the ultimate totals, the failure to support the totals with *26 a showing of the systematic compilation of information, and the doubts cast on the records by Florence's statements, we feel compelled to conclude that Barnes has failed to persuade us that its books and records accurately reflect its costs of operations. The respondent also determined that Barnes had gross income from the sale of tickets to other ticket brokers for the years 1955 through 1958. It is Barnes' position that sales to other ticket brokers were "wash sales"; that it merely picked up the tickets at the various box offices, and the brokers paid Barnes whatever it had paid the box office. These transactions were reflected on Barnes' books as wash sales. On the other hand, the respondent contends that the figures representing the purchases on these purported wash sales cannot be substantiated and that the amount of purchases was less than the amount of sales, resulting in gross income to Barnes. The information contained in Barnes' books and records regarding the purchases and sales to other brokers is significantly different. The original documents, that is the invoices, have also been destroyed. However, the books contain information relating to each transaction. Such *27 information includes the name of the source from whom the tickets were purchased, the person to whom they were sold, the amount paid for the tickets, the amount received for them, and the date of the transaction. Moreover, Anne, whose testimony we found credible, testified that she entered this information in the books contemporaneously with the purchase and sale of the tickets for other brokers. In view of the more detailed information in the books and the testimony that these entries were made contemporaneously, we hold that the books are sufficient evidence to establish the costs and selling prices for these transactions and that Barnes realized no income from them. The respondent further determined that Florence received income from Barnes in the amount of $40,109.34 as a result of Barnes transferring that amount to her in 1958. The respondent states that Florence's withdrawal of this amount from the corporate funds was actually a distribution of a dividend, but Florence contends that the transfer was a repayment of loans which she had made to the corporation. The books and records of Barnes show that over the years Florence several times advanced funds to Barnes and several *28 times withdrew funds. For the years 1954 through 1957, the books show that in each year the advances were almost equal to or greater than the withdrawals. But for 1958, the books show that Florence made no advances and withdrew $40,109.34. Overall, for the years 1954 through 1958, the books show that total advances equaled total withdrawals. There is a question as to whether the information in Barnes' books and records in regard to the advances and withdrawals by Florence is reliable. In view of the testimony regarding the advances and withdrawals and the fact that the books record withdrawals as well as advances, we have concluded that the books are reliable and sufficient to establish that such advances and withdrawals did in fact occur. The book entires of Barnes stated that the amounts that Florence advanced were "loans payable" to Florence. However, no notes were issued by Barnes to Florence, and no interest was ever due or paid. The respondent, therefore, argues that the book entires are insufficient to establish that in fact the advances were loans and not capital contributions. The respondent further argues that Barnes was undercapitalized since it only had total capital *29 ranging from about $22,000 to about $55,000 in the years 1955 through 1958 as compared to average annual purchases of over $400,000. Whether an advance of funds and subsequent withdrawal by a stockholder or a corporftion is a loan and repayment or a contribution to capital and dividend depends upon the intent of the parties at the time the advances and withdrawals were made. 2554-58 Creston Corp., 40 T.C. 932 (1963). Stated differently, the question is whether Florence advanced the funds to Barnes with reasonable expectations of repayment regardless of the success of the venture or whether she placed the funds at the risk of the business. Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957), remg. a Memorandum Opinion of this Court. We must infer the intent of the parties from a consideration of all of the facts and circumstances surrounding the transaction. Leach Corporation, 30 T.C. 563 (1958). An important factor in determining whether funds were to be placed at the risk of Barnes' business is the adequacy of the equity capital of that business. There should be a sufficient capital cushion to absorb a reasonable portion of the risk of loss of the *30 funds. Barnes did have throughout the years in question $22,000 or more in equity capital. The respondent contends that this amount was insufficient to conduct Barnes' business. While Barnes' annual purchases exceeded $400,000, its inventory turned over rapidly. Since unsold tickets could be returned to the box office, Barnes carried little or no permanent or continuing inventory. Such a rapid turnover of inventory makes the respondent's comparison of equity capital to cost of goods sold less meaningful. We believe that we must also reject the respondent's argument that since no notes were issued by Barnes to Florence and no interest was ever due or paid, the amounts advanced to Barnes were not loans. The advances were carried on Barnes' books as "loans payable." In view of the fact that Florence was the sole stockholder of Barnes, the informality and lack of an interest provision is not surprising. See, Irving T. Bush, 45 B.T.A. 609 (1941), revd. on other grounds 133 F. 2d 1005 (C.A. 2, 1943). The decisive consideration, in our view, is that repayment could have been expected within a relatively short time and did in fact occur within such time. Because *31 of the rapid turnover in the inventory of tickets, Florence could reasonably have expected, when she made the advances, that repayment would occur shortly; and indeed, the advances were repaid within 2 or 3 years, a relatively short time. Because of these circumstances, together with the characterization of the advances as "loans" in the books and records, we conclude that they were in fact loans and that the withdrawal by Florence in 1958 was a repayment of such loans and not a dividend. Since we have decided in this opinion that Barnes overstated its purchases and thereby received additional income during the years 1955 through 1958, we must consider the respondent's further determination that Florence received the amount of the additional income. The respondent contends that Florence received such income as distributions from Barnes, and hence she received income in excess of that reported on her returns. Florence did not testify and introduced no evidence to refute the respondent's determination in this regard. She relied instead on attempting to prove that the respondent's determinations in regard to Barnes were in error. Florence was the president and sole stockholder of *32 Barnes during the years 1955 through 1958. In view of her failure to rebut the presumption in favor of the respondent's determination relating to her and in view of her relationship to the corporation, we approve that determination. The respondent also determined that additions to the tax under section 293(a) of the Internal Revenue Code of 1939 and section 6653(a) of the Internal Revenue Code of 1954 for negligence or intentional disregard of rules and regulations were due from Florence for the years 1953 and 1955 through 1958. Florence did not contest these additions; therefore, we must uphold the respondent's determination. Pearl Zarnow, 48 T.C. 213 (1967); David Courtney, 28 T.C. 658 (1957). As an alternative, the respondent determined that if Florence did not receive additional income from Barnes, Albert did. The only connection of Albert with Barnes of which we are aware is that he was employed as treasurer. We do not believe that this connection is sufficient to attribute to him, without more, the unreported income of Barnes. Because of this insufficient connection and because of our conclusion that Florence received the *33 additional income from Barnes, we hold that Albert received no additional income from Barnes during the years 1955 through 1958. In order to reflect computations required by this opinion and the agreement of the parties concerning other adjustments in the notices of deficiency, Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Albert C. Eckardt and Cassandra Eckardt, docket No. 1211-64; and Florence M. Barnes, docket No. 1212-64.↩
2. Under section 293(a) of the Internal Revenue Code of 1939 and section 6653(a) of the Internal Revenue Code of 1954↩.