CITIZENS BANK & TRUST COMPANY, Executor of the Estate of John D. MacArthur and Catherine T. MacArthur

v.

The UNITED STATES.

No. 109–73.

United States Court of Claims.

July 14, 1978.

Laurence Goldfein, New York City, attorney of record, for plaintiffs; Richard A. Levine and Roberts & Holland, New York City, of counsel.

Allan C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

Before DAVIS, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiffs' motion, filed April 10, 1978, requesting that the court adopt the recommended decision of Trial Judge Philip R. Miller, filed October 5, 1977, pursuant to Rule 134(h), as the basis for its judgment in this case, defendant having withdrawn its previously filed notice of intention to except thereto. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended deci-

sion, as hereinafter set forth *, it hereby grants plaintiffs' motion of April 10, 1978, and affirms and adopts the decision as the basis for its judgment in this case. It is, therefore, concluded that plaintiffs are entitled to recover in accordance with the trial judge's decision and judgment is entered for plaintiffs with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

MILLER, Trial Judge.

This is a suit for refund of $224,849.70 in income taxes and interest paid for the year 1960 as a result of a deficiency assessment.

The facts are fully detailed in the findings. The opinion sets forth only those facts which are necessary to the decision.

Plaintiff,[1] John D. MacArthur (John), has at all pertinent times been the sole shareholder, chairman of the board of directors and chief executive officer of Bankers Life and Casualty Company (Bankers), an insurance company. Telfer MacArthur (Telfer), plaintiff's brother, was experienced in the printing and publishing business and was president of Pioneer Publishing Company (Pioneer).

In its operations Bankers required a considerable amount of printed materials, such as applications, medical forms, advertising circulars, and policies. Up to 1950 it printed some of such materials itself, in the basement of its home office, and purchased others from various printing companies, including companies owned and operated by Telfer. During 1950, Telfer and plaintiff agreed to form a corporation, Brookshore Company, which they would jointly own and which would supply Bankers' printing needs at standard going rates. Telfer agreed to manage, staff and supervise Brookshore, and John agreed to furnish most of its capital and to have Bankers purchase its printing needs from it. Each

was entitled to one-half of the outstanding stock. This agreement was effectuated in 1951.

In 1957, after Telfer had suffered a heart attack, he proposed to John that they enter into a mutual buy-out agreement. This agreement, executed June 29, 1957, acknowledged that they equally owned 2,235 of the outstanding 2,455 shares of Brookshore, and also all of the shares of Mackley Realty Company (Mackley), which they contributed to Brookshore. They agreed that upon the death of either, his estate was to sell his interest in Brookshore to the survivor and the survivor agreed to purchase such interest from the estate, at a stated price which increased with the passage of time prior to the date of death, with a maximum of $200,000 in the event death occurred after January 10, 1960.

Telfer died January 29, 1960. On February 10, 1960, John wrote to Telfer's widow, Elizabeth,—

As you undoubtedly know, Telfer insisted that I buy his half of Brookshore in the event of his death. I have every intention of keeping faith with him. When you make your final selection of a lawyer and qualify as executrix, let somebody in my office know and I will arrange to make the payment.

Thereafter, in February and March 1960, John requested Wayne R. Cook, an attorney employed by Bankers, to negotiate with Elizabeth and her attorneys in connection with fulfilling the terms and conditions of the 1957 agreement.

While never expressly repudiating its rights and obligations under the 1957 agreement, the representatives of the estate were not receptive to the $200,000 offer. Their reasons included the following:

(a) They believed that one-half of Brookshore, including its subsidiary, Mackley, was worth a great deal more than $200,000.

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed October 5, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. Since Catherine T. MacArthur is a party only by reason of the joint return, plaintiff will hereinafter be used in the singular to refer to John D. MacArthur.

(b) They wanted additional indemnity agreements from John against various liabilities which the estate might incur, and they did not want to deal with Bankers because of the belief that an insurance company could not properly enter into an indemnity agreement, and

(c) They also wanted John to purchase from the estate for additional consideration Telfer's stock interest in Pioneer.

On March 24, 1960, an agreement was entered into between Elizabeth, individually and as executrix under Telfer's will, and John. Elizabeth was to deliver all of the shares of Brookshore to John or upon his written direction. In return, John was to pay concurrently to Elizabeth $200,000 and to release, indemnify and hold harmless Elizabeth and Telfer's estate against any loss arising out of any claims by himself, by the various corporations, and by Telfer's former wife. In addition, Elizabeth agreed forthwith to deliver to John or upon his written direction the remaining shares of Pioneer, which the estate owned, in exchange for an additional $175,000. The agreement was also approved by representatives of Bankers, Brookshore and Mackley to indicate their approval of the releases.

On the same day, pursuant to the agreement, Bankers issued a check in the sum of $375,000 to a bank and the latter in turn issued a cashier's check in the same amount payable to the estate of Telfer. Wayne Cook, on behalf of Bankers, delivered the check to Elizabeth's attorneys, and she deposited it in the estate's account. In return, Elizabeth's attorneys delivered the Brookshore, Mackley and Pioneer shares to Bankers.

It is stipulated that $200,000 of the $375,000 was for the Brookshore and Mackley shares and that the fair-market-value of such shares was at least $244,000.

The Commissioner of Internal Revenue determined that because the $200,000 payment satisfied John's obligation in the same amount and because Bankers had earnings and profits in excess of $200,000, Bankers' payment in that amount constituted a dividend to John. This is also defendant's primary position in this case.

In support of its position defendant relies on two cases, *Sullivan v. United States*, 363 F.2d 724 (8th Cir. 1966), *cert. denied*, 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622, *rehearing denied*, 388 U.S. 924, 87 S.Ct. 2104, 18 L.Ed.2d 1378 (1967) and *Wall v. United States*, 164 F.2d 462 (4th Cir. 1947).

In *Sullivan* the taxpayer was the majority stockholder in a corporation in which there was only one other stockholder, Nelson. Sullivan had unconditionally agreed that upon Nelson's termination of his employment he would repurchase the stock from Nelson at book value. When Nelson did leave, instead of repurchasing the stock himself, Sullivan caused the corporation to do so. In agreeing with the Government that Sullivan had received a dividend in the amount of the corporation's payment to Nelson, the court concisely stated its rationale (363 F.2d at 729):

> After the transaction was completed, the relevant facts were essentially as follows: (1) Sullivan's personal obligation had been discharged (2) Sullivan owned all of the outstanding shares of stock of the corporation (3) the corporation's assets were decreased by the amount paid to Nelson for his stock (4) Nelson's stock was held by the corporation as treasury stock. It is true that in terms of the financial worth of Sullivan's interest in the corporation, it was the same after the transaction as it was before. The transaction still resulted in an economic benefit to Sullivan, however, because he was relieved of his personal obligation to purchase Nelson's stock. [Footnotes omitted.]

In *Wall*, plaintiff was one of two equal shareholders. Plaintiff purchased the shares of the other shareholder for a cash down payment plus promissory notes payable in 10 successive years, with the stock to be held by trustees as security for the notes but otherwise for the benefit of plaintiff. After only a single year, the corporation assumed payment of the annual liability on the notes. Plaintiff transferred to the cor-

poration his equity in the stock held by the trustees and the corporation entered such stock on its books as treasury stock. The court upheld the Government's position that the annual payments represented dividend income to plaintiff because (at 464)—

> [t]he transaction is regarded as the same as if the money had been paid to the taxpayer and transmitted by him to the creditor; and so if a corporation, instead of paying a dividend to a stockholder, pays a debt for him out of its surplus, it is the same for tax purposes as if the corporation pays a dividend to a stockholder, and the stockholder then utilizes it to pay his debt.

■ Neither of these decisions is authority for the defendant's position herein. They do support the idea that a corporation's satisfaction of its stockholder's debt gives him an economic benefit; but defendant ignores the fact that a payment to or for the benefit of a stockholder is not the only element of a dividend. A dividend also necessitates a distribution of corporate earnings and profits. I.R.C. § 316.[2] Therefore, an exchange of assets of equal value which does not reduce corporate net worth cannot be a distribution of earnings and profits and hence is not a dividend.

This was made clear in *Palmer v. Commissioner of Internal Revenue*, 302 U.S. 63, 69–70, 58 S.Ct. 67, 70, 82 L.Ed. 50 (1937), wherein the Court stated:

> While a sale of corporate assets to stockholders is, in a literal sense, a distribution of its property, such a transaction does not necessarily fall within the statutory definition of a dividend. For a sale to stockholders may not result in any diminution of its net worth and in that case cannot result in any distribution of its profits.
>
> * * * [T]he bare fact that a transaction, on its face a sale, has resulted in a distribution of some of the corporate assets to stockholders, gives rise to no inference that the distribution is a dividend within the meaning of § [316]. To transfer it from one category to the other, it is

at least necessary to make some showing that the transaction is in purpose or effect used as an implement for the distribution of corporate earnings to stockholders.

While the issue in *Palmer* was whether or not a sale of corporate property to stockholders resulted in a dividend to them, the principles underlying the decision are equally applicable to an exchange of property arising out of a purchase by a corporation. Both the courts and the Commissioner of Internal Revenue have ruled that a corporate payment of money or property to a stockholder to acquire corporate assets at a fair price does not reduce earnings and profits and is not a dividend. *Commissioner of Internal Revenue v. Pope*, 239 F.2d 881 (1st Cir. 1957); *Rodman Wanamaker Trust v. Commission of Internal Revenue*, 11 T.C. 365 (1948); *aff'd per curiam*, 178 F.2d 10 (3rd Cir. 1949); *Curran v. Commissioner of Internal Revenue*, 49 F.2d 129 (8th Cir. 1931); *Cramer v. Commissioner of Internal Revenue*, 20 T.C. 679, 684–85 (1953); Rev.Rul. 59–97, 1959–1 C.B. 684.

■ For the same reasons, a corporation's assumption and payment of its stockholder's obligation to purchase from a third person an asset of equal or greater value cannot be deemed a dividend to the stockholder if the corporation acquires the asset. Just such a case was presented in *Easson v. Commissioner of Internal Revenue*, 294 F.2d 653 (9th Cir. 1961). There the taxpayer owned real property which was encumbered by a mortgage with respect to which the taxpayer was personally liable on the underlying notes. He transferred the property subject to the mortgage to a corporation in exchange for all its stock, but remained personally liable on the notes. The Commissioner contended that when the corporation made payments on the mortgage notes the taxpayer in effect received dividend income because such payments discharged taxpayer's legal obligation. The court rejected that contention with the following explanation (at 661):

---

**2.** The term I.R.C. refers to the Internal Revenue Code of 1954 exclusively.

While the corporation may incidentally have benefited taxpayer by reducing the mortgage, it is clear that the corporation did not thereby distribute any assets The corporation owned the apartment subject to the mortgage and as the mortgage decreased its equity in the apartment house increased. Thus when it took money out of cash and applied that amount to the mortgage, its net worth remained constant. Its total assets were unchanged because the credit to the cash account was offset by a corresponding debit to the fixed assets account.

And *see also Stout v. Commissioner of Internal Revenue,* 273 F.2d 345 (4th Cir. 1959).

*Sullivan* and *Wall* are distinguishable from the other cases discussed by the fact that the corporations there received no property in exchange for paying their stockholders' obligations. Because they received only their own stock, their net worth was reduced and they had to deplete their earnings and profits to make the payments. In substance, the transactions were stock redemptions in favor of the plaintiffs which were essentially equivalent to dividends and hence taxable as such. (*See* I.R.C. § 302(b).) In *Sullivan*, as the extract from the opinion previously quoted shows, the court stated that it was a relevant fact that corporation's assets were decreased by its payment. In *Wall*, the taxpayer argued that because the shares acquired by virtue of the payments were kept in the corporate treasury they remained assets, but the court responded that irrespective of whether or not they were kept in the treasury (164 F.2d at 465), "As a practical matter, such shares are redeemed in the sense that they no longer constitute any liability of the corporation but represent nothing more than an opportunity to acquire new assets by a reissuance."

█ Since in return for the $200,000 payment to Telfer's estate Bankers received shares of Brookshore which had an agreed fair-market-value of at least $244,000, it is concluded that Bankers did not distribute any of its earnings and profits by virtue of having satisfied plaintiff's obligation to make such a purchase. Furthermore, the very fact that the purchase was such a bargain makes it difficult to understand how Bankers benefited plaintiff at all by taking over his opportunity to make the purchase. Indeed, the undisputed testimony was that Telfer's estate, the sellers, maintained in the negotiations that the $200,000 plaintiff offered was less than the fair value of their Brookshore shares and sought to avoid their agreement to sell them to plaintiff at such price. Thus it can hardly be said that plaintiff was benefited by being relieved of an "obligation," "liability" or "debt" in the onerous sense which those terms ordinarily connote.

Defendant argues alternatively that the $200,000 payment to Telfer's estate was a dividend pursuant to I.R.C. § 304. Insofar as pertinent, that section provides:

§ 304. Redemption through use of related corporations

(a) Treatment of certain stock purchases.—

(1) Acquisition by related corporation (other than subsidiary).—For purposes of sections 302 and 303, if—

(A) one or more persons are in control of each of two corporations, and

(B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control.

then * * * such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

Subsection 304(c) defines control for purposes of the section as meaning ownership of at least 50 percent of the voting stock. Subsection 304(b) provides that the amount constituting a dividend shall be determined by reference to the earnings and profits of the acquiring corporation. If a distribution in redemption is found, reference must be

made to section 302, which sets forth the standards for determining whether it is to be treated as a dividend or a return of capital. In general, a distribution in redemption is a dividend unless it is not essentially equivalent to a dividend.

■ Plaintiff objects to defendant raising his defense on the ground that it was not the basis of the assessment, was not raised in the answer nor pretrial submissions, and did not surface until just before trial. However, since plaintiff's burden is to establish he has overpaid his income taxes for the taxable year without regard to the basis for the assessment (*Dysart v. United States,* 340 F.2d 624, 169 Ct.Cl. 276 (1965)), and since the issue is one of law and plaintiff has not demonstrated how it has been prejudiced by defendant's tardiness, such defense will be considered on the merits.

Plaintiff and defendant agree that subsection 304(a)(1) is designed to prevent a stockholder who controls two corporations from drawing off accumulated corporate earnings through the device of selling part of his stock in one corporation to the other. Plaintiff had controlling interests in both corporations. Defendant contends that the 1960 transaction was the constructive equivalent of plaintiff obtaining the remaining 50 percent of Brookshore shares from Telfer's estate and then selling them to Bankers in return for Bankers assuming and paying plaintiff's obligation for the purchase price.

To apply section 304 in this manner would be to distort rather than to further the statutory purpose. The entire focus of the section is on closing a loophole. Sales proceeds received by a stockholder from a controlled corporation should be treated as dividend income rather than return of capital or capital gain if what the corporation acquires is nothing more than the stock of another corporation the same stockholder controls; for, under such circumstances, the sale is only a transfer from one pocket to another.[3]

■ An obvious prerequisite for invoking subsection 304(a)(1) is that the stockholder must have received the sales proceeds. Here, however, when the transaction was completed the $200,000 sales proceeds were received by a third person, Telfer's estate, and not by plaintiff. The superseding of plaintiff's obligation to buy the stock at less than fair-market-value was not an assumption of a liability nor a benefit to plaintiff. It was a mere incident to Banker's payment and the estate's receipt of the purchase price.

Another prerequisite for application of the statute is that the stockholder must have owned the stock before the transfer; or else the corporation cannot have acquired it from him, but must have acquired it from a third person. *Maher v. Commissioner of Internal Revenue,* 55 T.C. 441 (1970), *aff'd on this issue,* 469 F.2d 225 (8th Cir. 1972). Here, however, plaintiff did not own the additional 50 percent stock interest in Brookshore which was the subject of the acquisition by Bankers. Telfer's estate owned the shares and would not convey them to anyone until it received at least $200,000 in cash for them. Since it was Bankers and not plaintiff which paid the $200,000, there is no basis for imputing to plaintiff acquisition of the shares for himself or ownership at any time. Thus, Bank-

---

3. The House Committee Report on section 304 gave the following as the purpose of the section (H. Rep. No. 1337, 83d Cong., 2d Sess., 37, *reprinted in* [1954] U.S. Code Cong. & Admin. News pp. 4025, 4062):

While your committee has retained the provision of existing law which prevents tax avoidance where a subsidiary corporation purchases stock in its parent from the shareholders of the parent, there has come to the attention of your committee an area of possible tax avoidance by the use of substantially the same device. This involves sales of stock between corporations owned by the same interests. Thus, an individual owning all of the stock of two corporations may sell stock of one to the other. Under these circumstances, your committee has provided that where the effect of the sale is in reality the distribution of a dividend, such sale will be taxed as such.

The Senate Committee Report is substantially the same. (S. Rep. No. 1622, 83d Cong., 2d Sess. 45–46, *reprinted in,* [1954] U.S. Code Cong. & Admin. News p. 4676.)

ers necessarily acquired them from a third person and not from plaintiff.

It is concluded, therefore, that plaintiff is entitled to judgment.[4]

### CONCLUSION OF LAW

The court has jurisdiction of the parties and of the claim. Plaintiff is entitled to judgment for the recovery of overpaid taxes and interest as set forth in the findings and foregoing opinion. Determination of the amount thereof is reserved for further proceedings pursuant to Rule 131(c).

---

4. Plaintiff makes several other contentions: that from the time of the original investment in Brookshore he was acting as agent for Bankers; that the 1957 agreement was breached, terminated or rescinded by Telfer during his lifetime; and that it was rescinded after Telfer's death. Defendant denies these contentions and also argues that plaintiff is barred from making them because he never raised them in his claim for refund filed with the Internal Revenue Service and, indeed, that they are inconsistent with the contents of the claim. In view of the clear basis for decision herein, it is unnecessary to discuss the merits of these additional contentions in this opinion. The facts necessary for the resolution of such additional issues are fully detailed in the findings.